**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| PLANNED PARENTHOOD OF INDIANA AND KENTUCKY, INC., DR. MARSHALL LEVINE, M.D., | ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:16-cv-00763-TWP-DML |
| COMMISSIONER, INDIANA STATE DEPARTMENT OF HEALTH in his official capacity, *et al.*, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## ENTRY GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

This matter is before the Court on a Motion for Preliminary Injunction filed pursuant to Federal Rule of Civil Procedure 65(a) by Plaintiffs Planned Parenthood of Indiana and Kentucky, Inc. and Dr. Marshall Levine (collectively "PPINK"). (Filing No. 7.) PPINK filed this suit against the Commissioner of the Indiana State Department of Health ("ISDH"), the prosecutors of Marion County, Lake County, Monroe County, and Tippecanoe County, and members of the Medical Licensing Board of Indiana (collectively "the State"), all in their official capacities.

On March 24, 2016, the Governor of Indiana signed into law House Enrolled Act No. 1337 ("HEA 1337"), which creates new regulations of abortion and practices related to abortion. PPINK maintains that several provisions of HEA 1337 are unconstitutional, and it seeks to enjoin the implementation and enforcement of these provisions during the pendency of this litigation and prior to July 1, 2016, the date on which the provisions take effect. PPINK seeks a preliminary injunction as to three aspects of HEA 1337: (1) the anti-discrimination provisions, which preclude abortions if sought solely for certain reasons enumerated in the statute such as the fetus's race, sex,

or disability; (2) the information dissemination provision, which requires abortion providers to inform their patients of the anti-discrimination provisions and the types of abortions those provisions prohibit; and (3) the fetal tissue disposition provisions, which require fetal tissue to be disposed of in a manner similar to that of human remains.

The parties submitted evidence, and the Court held a hearing on PPINK's Motion. For the reasons that follow, PPINK is entitled to an injunction as to all of the challenged provisions. PPINK is likely to succeed on the merits of its challenge to the anti-discrimination provisions because they directly contravene the principle established in *Roe v. Wade*, 410 U.S. 113 (1973), that a state may not prohibit a woman from making the ultimate decision to have an abortion prior to fetal viability. Similarly, the information dissemination provision is likely unconstitutional as it requires abortion providers to convey almost certainly false information to their patients. In addition, PPINK faces irreparable harm of a significantly greater magnitude if these provisions are not enjoined than that faced by the State from an injunction.

PPINK's challenges to the fetal tissue disposition provisions present a much closer call and present difficult legal questions about which there are few clear answers. In the end, however, the Court concludes that the State's asserted interest in treating fetal remains with the dignity of human remains is not legitimate given that the law does not recognize a fetus as a person. Therefore, PPINK has a strong likelihood of success on its substantive due process challenge to these provisions as well. Because the balance of harms also favors PPINK regarding this claim, PPINK has demonstrated that the Court should enjoin the fetal tissue disposition provisions pending resolution of this litigation.

Accordingly, PPINK's Motion for Preliminary Injunction is **GRANTED** (Filing No. 7).

# I.     LEGAL STANDARD

A preliminary injunction is an extraordinary remedy never awarded as of right.  In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

> To obtain a preliminary injunction, a party must establish [1] that it is likely to succeed on the merits, [2] that it is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in its favor, and [4] that issuing an injunction is in the public interest.

*Grace Schools v. Burwell*, 801 F.3d 788, 795 (7th Cir. 2015); *Winter*, 555 U.S. at 20.  "The court weighs the balance of potential harms on a 'sliding scale' against the movant's likelihood of success: the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor."  *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015).  "The sliding scale approach is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief."  *Stuller, Inc. v. Steak N Shake Enterprises, Inc.*, 695 F.3d 676, 678 (7th Cir. 2012) (citation and internal quotation marks omitted).  "Stated another way, the district court 'sit[s] as would a chancellor in equity' and weighs all the factors, 'seeking at all times to minimize the costs of being mistaken.'"  *Id.* (quoting *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992)).

# II.     BACKGROUND

PPINK is a non-profit healthcare provider which offers reproductive healthcare, family planning, and preventive primary-care services. It operates twenty-three health centers in Indiana and two in Kentucky.  Three of the Indiana health centers, located in Bloomington, Merrillville,

and Indianapolis, provide surgical abortion services to patients.  Surgical abortions are available at these centers only through the first trimester of pregnancy.  Plaintiff Dr. Levine is one of the physicians who provides surgical abortions for PPINK.

The Indiana legislature recently passed HEA 1337, which becomes effective on July 1, 2016.  HEA 1337 creates several new provisions and amends several others regarding Indiana's regulations of abortion and practices related to abortions.  Three aspects of HEA 1337 are challenged by PPINK in this action.  The parties essentially do not dispute the key background facts related to the challenged provisions, nor do they dispute the potential consequences of these provisions for PPINK and its patients.  The Court will therefore briefly set forth the challenged provisions and summarize the background evidence related to each provision.

A.    **Anti-Discrimination and Information Dissemination Provisions**

HEA 1337 creates Indiana Code § 16-34-4, and is entitled "Sex Selective and Disability Abortion Ban."  This provision bans abortions sought solely for certain enumerated reasons. Specifically, HEA 1337 provides that "[a] person may not intentionally perform or attempt to perform an abortion before the earlier of viability of the fetus or twenty (20) weeks of postfertilization age if the person knows that the pregnant woman is seeking" an abortion: (1) "solely because of the sex of the fetus," §§ 16-34-4-4, 16-34-4-5; (2) "solely because the fetus has been diagnosed with, or has a potential diagnosis of, Down syndrome or any other disability," §§ 16-34-4-6, 16-34-4-7; or (3) "solely because of the race, color, national origin, or ancestry of the fetus," § 16-34-4-8.  The phrase "potential diagnosis" is defined as "the presence of some risk factors that indicate that a health problem may occur."  Ind. Code § 16-34-4-3.  Moreover, HEA 1337 requires abortion providers to complete a form provided by ISDH that indicates, among other things, the "gender of the fetus, if detectable," and "[w]hether the fetus has been diagnosed with

4

or has a potential diagnosis of having Down syndrome or any other disability." Ind. Code § 16-34-2-5(a)(6).

Indiana law sets forth consequences for abortion providers who violate these provisions. Currently, it is a felony to knowingly or intentionally perform an abortion that is not permitted by Indiana law, and HEA 1337 does not change this. *See* Ind. Code § 16-34-2-7(a). Moreover, HEA 1337 provides that "[a] person who knowingly or intentionally performs an abortion in violation of this chapter may be subject to: (1) disciplinary sanctions under IC 25-1-9; and (2) civil liability for wrongful death." Ind. Code § 16-34-4-9(a).

Not only does HEA 1337 preclude abortions sought solely for one of the enumerated reasons, but the information dissemination provision requires abortion providers to inform their patients of the anti-discrimination provisions. Specifically, abortion providers must inform their patients "[t]hat Indiana does not allow a fetus to be aborted solely because of the fetus's race, color, national origin, ancestry, sex, or diagnosis or potential diagnosis of the fetus having Down syndrome or any other disability." Ind. Code § 16-34-2-1.1(a)(1)(K).

The State presents evidence that these provisions were passed in light of technological developments that allow the diagnosis or potential diagnosis of fetal disabilities to be made early in a pregnancy. In particular, Cell-free fetal DNA testing is able to screen for several genetic abnormalities, including Down syndrome, as early as ten weeks into pregnancy. Tests such as the Cell-free fetal DNA test are screening tests rather than diagnostic tests, and as such, only reveal the likelihood of genetic abnormality.

The parties are essentially in agreement that a significant number of women have sought, and will continue to seek, an abortion solely because of the diagnosis of a disability or the risk thereof. (*See, e.g.*, Filing No. 30-1 at 2-3) (attestation from the CEO of PPINK that it has and will

continue to provide abortions to women who seek an abortion "solely because of a diagnosis of fetal Down syndrome or other genetic disabilities or the possibility of such a diagnosis"); Filing No. 54 at 14-15 (citing statistics regarding the percentage of fetuses diagnosed with Down syndrome that are aborted)).  Moreover, the parties agree that the number of women who will seek an abortion at least in part out of these concerns will likely increase as testing is more widely available than ever before.

**B.**      **Fetal Tissue Disposition Provisions**

HEA 1337 also changes the manner in which fetal tissue must be disposed.  Under current Indiana law, "[a] pregnant woman who has an abortion . . . has the right to determine the final disposition of the aborted fetus."  Ind. Code § 16-34-3-2.  If the woman decides to let the facility performing the abortion dispose of the fetal tissue, Indiana regulations require that the facility bury or cremate the fetal tissue.  *See* 410 I.A.C. § 35-2-1(a).

Currently, if a medical facility elects to cremate fetal tissue, it must do so by using a "crematory" or by "incineration as authorized for infectious and pathological waste."  410 I.A.C. § 35-1-3.  Pathological waste includes tissues, organs, body parts, and blood or bodily fluid "that are removed during surgery, biopsy, or autopsy."  Ind. Code § 16-41-16-5.  Infectious waste includes pathological waste, Indiana Code § 16-41-6-4(b), and it can be destroyed through various procedures including incineration, Indiana Code § 16-41-6-3(b).  Therefore, as it currently stands, the woman can determine to bury, cremate, or otherwise dispose of the fetal tissue herself, or the fetal tissue may be incinerated along with other human surgical byproducts such as organs.  PPINK currently utilizes a contractor who periodically incinerates the fetal tissue along with other surgical byproducts.

HEA 1337 alters the manner in which healthcare providers must handle fetal tissue in instances where the patient does not elect to retain it and dispose of it herself.  It provides that "[a]n abortion clinic or health care facility having possession of an aborted fetus shall provide for the final disposition of the aborted fetus.  The burial transit permit requirements of IC 16-37-3 apply to the final disposition of an aborted fetus, which must be interred or cremated."  Ind. Code § 16-34-3-4(a).  A "burial transit permit" is "a permit for the transportation and disposition of a dead human body required under IC 16-37-3-10 or IC 16-37-3-12."  Ind. Code § 23-14-31-5.

Moreover, HEA 1337 excludes "an aborted fetus or a miscarried fetus" from the definition of "infectious waste."  Ind. Code § 16-41-16-4(d).  This means that if a healthcare provider elects to use cremation rather than interment, the cremation of the fetal tissue must be performed at a crematory.  However, the cremation of fetal tissue need not each be performed separately; HEA 1337 explicitly provides that "[a]borted fetuses may be cremated by simultaneous cremation."  Ind. Code § 16-34-3-4(a).  In exploring compliance with these new provisions, PPINK has been informed by the ISDH that its plan to aggregate "the products of conception in a container suitable for cremation and then, periodically, [have] the container delivered to a crematorium for final disposition" will comply with the statute (Filing No. 54-10 at 2).

PPINK produced evidence that compliance with the new fetal tissue disposition provisions will result in a meaningful increase in its expenses.  Specifically, the annual cost of disposing fetal tissue will increase from its current level of $15,500.00, to between $36,000.00 and $63,000.00, and there will be an additional up front cost of $5,000.00 to $9,000.00 for PPINK to purchase a crypt at a cemetery and to periodically open and close the crypt to deposit the cremains (Filing No. 57-2 at 3-4).

### III.   DISCUSSION

To obtain a preliminary injunction, PPINK must establish the following four factors as to each provision it seeks to enjoin: (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that issuing an injunction is in the public interest.  *Grace Schools*, 801 F.3d at 795.  The first two factors are threshold determinations; "[i]f the moving party meets these threshold requirements, the district court 'must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied.'"  *Stuller,* 695 F.3d at 678 (quoting *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)).  The Court will address the first two threshold factors before addressing the final factors that it must consider.

### A.   Likelihood of Success on the Merits

PPINK raises constitutional challenges to three provisions of HEA 1337, which are addressed in turn.

### 1.   Anti-Discrimination Provisions

PPINK contends that the anti-discrimination provisions clearly violate well-established Supreme Court precedent in that they prohibit women from obtaining an abortion prior to fetal viability.  The State acknowledges that HEA 1337 represents a "qualitatively new kind of abortion statute," and, as such, it argues that the Supreme Court precedents on which PPINK relies do not address, and therefore, do not govern the constitutionality of these provisions (Filing No. 54 at 11).

"It is a constitutional liberty of the woman to have some freedom to terminate her pregnancy."  *Planned Parenthood v. Casey*, 505 U.S. 833, 846 (1992).  This right is grounded in the right to privacy rooted in "the Fourteenth Amendment's concept of personal liberty."  *Roe*, 410

U.S. at 153; *see Casey*, 505 U.S. at 846 ("[c]onstitutional protection of the woman's decision to terminate her pregnancy derives from the Due Process Clause of the Fourteenth Amendment."). This right was first articulated in *Roe* but has since been repeatedly re-examined by the Supreme Court. Despite the Supreme Court's frequent revisiting of the issue, certain core principles have essentially remained unchanged since *Casey*, where a plurality of the Supreme Court reaffirmed *Roe*'s essential holding. 505 U.S. at 846. The essential holding of *Roe* has three parts:

> First is a recognition of the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State. Before viability, the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure. Second is a confirmation of the State's power to restrict abortions after fetal viability, if the law contains exceptions for pregnancies which endanger the woman's life or health. And third is the principle that the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child.

*Id.*[1]

The anti-discrimination provisions of HEA 1337 clearly violate the first of these principles in that they prevent women from obtaining certain abortions before fetal viability. The woman's right to choose to have an abortion pre-viability is categorical; "a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability." *Caesy*, 505 U.S. at 879; *id.* at 870 ("[b]efore [viability] the woman has a right to choose to terminate her

---

[1] Although only a plurality of the Supreme Court articulated these principles in *Casey*, subsequent Supreme Court decisions have recognized and applied these principles when considering challenges to abortion laws. *See Gonzales v. Carhart*, 550 U.S. 124, 145-46 (2007); *Stenberg v. Carhart*, 530 U.S. 914, 920 (2000). In *Stenberg*, for example, a majority of the Supreme Court characterized these principles as "established" and applied them as such to Nebraska's partial birth abortion ban. 530 U.S. at 921. More recently, in *Gonzales*, the Supreme Court only "assume[d]" that these principles governed. 550 U.S. at 146. Nevertheless, federal courts have recognized that this assumption merely signaled that the Supreme Court may be open to re-evaluating those principles in the future, not that those principles no longer represented the governing law. *See, e.g., MKB Management Corp. v. Stenehjem*, 795 F.3d 768, 772 (8th Cir. 2015) (acknowledging that in *Gonzales* the Supreme Court only "assume[d]" *Casey*'s principles governed, but reasoning that "[e]ven so, the [Supreme Court] has yet to overrule the *Roe* and *Casey* line of cases. Thus we, as an intermediate court, are bound by those decisions"). Indeed, the Seventh Circuit has treated these principles as binding precedent. *See Planned Parenthood of Ind., Inc. v. Commissioner of Ind. State Dep't of Health*, 699 F.3d 962, 987 (7th Cir. 2012). Perhaps because of this, the parties do not dispute that the principles articulated in *Casey* and subsequently applied in *Stenberg* and *Gonzales* constitute binding precedent.

pregnancy."); *Stenberg*, 530 U.S. at 920 (same); *Gonzales*, 550 U.S. at 146 (same).  As stated by the Seventh Circuit, "the constitutional right to obtain an abortion is a right against coercive governmental burdens; the government may not 'prohibit any woman from making the ultimate decision to terminate her pregnancy' before fetal viability." *Planned Parenthood of Ind.,* 699 F.3d at 987 (7th Cir. 2012) (quoting *Casey*, 505 U.S. at 874, 879).  Given the categorical nature of this principle, circuit courts have consistently held that any type of outright ban on certain pre-viability abortions is unconstitutional.  *See MKB Management Corp.*, 795 F.3d at 773 (holding that a state law was unconstitutional because "we are bound by Supreme Court precedent holding that states may not prohibit pre-viability abortions" and the challenged law "generally prohibits abortions before viability"); *McCormack v. Herzog*, 788 F.3d 1017, 1029 (9th Cir. 2015) (holding that a state law was unconstitutional because its "broad[] effect . . . is a categorical ban on *all* abortions between twenty weeks gestational age and viability," which "is directly contrary to the [Supreme] Court's central holding in *Casey* that a woman has the right to 'choose to have an abortion *before viability* and to obtain it without undue interference from the State'") (quoting *Casey*, 505 U.S. at 846).

Nevertheless, the State attempts to accomplish via HEA 1337 precisely what the Supreme Court has held is impermissible.  The anti-discrimination provisions prohibit a woman from choosing to have an abortion pre-viability if the abortion is sought solely for one of the enumerated reasons.  For this Court to hold such a law constitutional would require it to recognize an exception where none have previously been recognized.  Indeed, the State has not cited a single case where a court has recognized an exception to the Supreme Court's categorical rule that a woman can choose to have an abortion before viability.  This is unsurprising given that it is a woman's right to *choose* an abortion that is protected, which, of course, leaves no room for the State to examine

the basis or bases upon which a woman makes her choice.  *See Casey*, 505 U.S. at 846 (stating that it is a woman's "*decision* to terminate her pregnancy" that is protected by the Fourteenth Amendment) (emphasis added); *id.* at 879 ("[a] State may not prohibit any woman from *making the ultimate decision* to terminate her pregnancy before viability.") (emphasis added).  Based on this categorical rule, PPINK's likelihood of success on the merits of this claim appears quite strong.

The State resists this conclusion on multiple bases.  First, the State casts the anti-discrimination provisions as the next iteration of our society's prohibition on discrimination.  The State points to technological advances allowing earlier and more accurate information regarding whether a fetus has a diagnosis or potential diagnosis of Down syndrome or other disabilities. These technological advances, says the State, have led in part to an increase in the number of abortions sought for reasons related to those disabilities.  Because the Supreme Court has recognized that the State has a legitimate interest in protecting potential life even from the outset of a pregnancy, the State maintains that the anti-discrimination provisions simply further its interest in protecting the potential life from discrimination.

The State is correct that the Supreme Court has consistently recognized that "the State has legitimate interests from the outset of the pregnancy in protecting . . . the life of the fetus that may become a child."  *Casey*, 505 U.S. at 846.  But while this is true, the State simply ignores that the Supreme Court in *Casey* "struck a balance" between this interest and a woman's liberty interest in obtaining an abortion.  *Gonzales*, 550 U.S. at 146.  These interests weigh differently depending on whether the fetus is viable.  Before viability, the Supreme Court made clear that "the State's interests are not strong enough to support a prohibition of abortion."  *Casey*, 505 U.S. at 846; *see id.* at 869 ("[a]t a later point in fetal development,"—namely, viability—"the State's interest in

11

life has sufficient force so that the right of the woman to terminate the pregnancy can be restricted.").

Therefore, although the State's interest in protecting and even promoting potential life is a legitimate one, the Supreme Court has already weighed this interest against a woman's liberty interest in choosing to have an abortion and concluded that, prior to viability, the woman's right trumps the State's interest. This is the "central holding" of *Roe*, and the State's position would require this Court to undermine that holding, which of course it cannot do. *See Stenehjem*, 795 F.3d at 772 ("[t]he [Supreme Court] has yet to overrule the *Roe* and *Casey* line of cases," and thus all federal courts "are bound by those decisions"). Accordingly, the State's focus on the technological developments since *Roe* and *Casey* are unpersuasive. This case is not about technological developments, but rather about a woman's liberty interest weighed against the State's interest in potential life. Developments in technology related to disability screening and the consequences that flow from those developments do not give this Court license to reevaluate the Supreme Court's judgment as to the balancing of these interests.

Second, the State advances a so-called "binary choice" interpretation of *Roe* and *Casey*, which, if accepted, would support the State's position that "HEA 1337 does not interfere with a right protected by *Roe* and *Casey*." (Filing No. 54 at 28.) The State's argument begins with the woman's liberty interest as articulated in *Casey*: "'the right of the *individual* . . . to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether *to bear or beget a child*.'" *Casey*, 505 U.S. at 851 (quoting *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972)) (second emphasis added). According to the State, "[t]his right represents a binary choice: one either chooses, free of government coercion and intrusion, to 'bear or beget a child,' or one chooses to have an abortion so as not to 'bear or beget a child.'" (Filing

No. 54 at 28.)  The purpose of the right, continues the State, "is to prevent women from being forced to carry a child to term, even though she does not want a child at all.  *Casey* and *Roe* do not create, on the other hand, a right to abort an otherwise wanted child on a discriminatory basis." (Filing No. 54 at 29.)

The difficulty with the State's position is that there is nothing in *Roe* or *Casey* that limits the right to have an abortion pre-viability to women who do not want to have a child at all as opposed to those who do not want to see a particular pregnancy through to birth.  The quote from *Casey* on which the State relies certainly does not make clear one way or another whether a woman's right to decide whether to bear a child refers to the decision to have a child generally or whether to continue a specific pregnancy.  And the State does not cite a single legal authority that has recognized its binary choice theory or its proffered interpretation of *Roe* or *Casey*.

The lack of authority supporting the State's position likely stems from the fact that it is contrary to the core legal rights on which a woman's right to choose to terminate her pregnancy prior to viability are predicated.  The Supreme Court has mandated that this right stems from a liberty right protected by the Fourteenth Amendment—specifically, a woman's right to *privacy*. *See Roe*, 410 U.S. at 153.  Such a right "includes the interest in independence in making certain kinds of important decisions," such as whether to terminate a pregnancy.  *Casey*, 505 U.S. at 859 (citation and quotation marks omitted).  PPINK's claim is based on an infringement of this privacy right—the woman's right to make the important, personal, and difficult decision of whether to terminate her pregnancy.  As stated above, the Supreme Court has weighed this right against the State's interest in protecting potential life and determined that the woman's privacy right— although "not . . . unlimited"—is strong enough pre-viability to preclude the State from preventing

13

her "from making the ultimate decision to terminate her pregnancy before viability."  *Casey*, Id. at 879.

Under the State's theory, a woman either wants to have a child or does not; and, once a woman chooses the former, she cannot then terminate her pregnancy for reasons the State deems improper.  But the very notion that, pre-viability, a State can examine the basis for a woman's choice to make this private, personal and difficult decision, if she at some point earlier decided she wants a child as a general matter, is inconsistent with the notion of a right rooted in privacy concerns and a liberty right to make independent decisions.

The State's theory is also contrary to the reality that the decision to terminate a pregnancy involves "intimate views with infinite variations."  *Id.* at 853.  For example, PPINK points out, "under the State's theory there would be no constitutional protection for a woman who decides because of a loss of a job, dissolution of a marriage, illness of another child, personal illness, or the eruption of violence within the home, that she must end her pregnancy.  The 'binary-choice' theory is therefore not tethered to the State's anti-discrimination rationale and would, if accepted, result in the State being able to prohibit any pre-viability abortion if the woman had not made the determination that she wanted an abortion at, or prior to, the moment of conception."  (Filing No. 57 at 7.)

To summarize, nothing in *Roe*, *Casey*, or any other subsequent Supreme Court decisions suggests that a woman's right to choose an abortion prior to viability can be restricted if exercised for a certain reason.  The right to a pre-viability abortion is categorical.  Indeed, the Seventh Circuit has described "the mother's right to abort a fetus that has not yet become viable [as] essentially absolute."  *Coe v. County of Cook*, 162 F.3d 491, 493 (7th Cir. 1998).  This is because, despite the State's legitimate interest in potential life during the entirety of the pregnancy, "[b]efore viability,

14

the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure." *Casey*, 505 U.S. at 846. The Supreme Court has already balanced the parties' interests and concluded that the State's pre-viability interests are simply not strong enough for it to lawfully prohibit pre-viability abortions. Yet HEA 1337 does just that. Accordingly, PPINK has a strong likelihood of success on the merits of its claim that the anti-discrimination provisions of HEA 1337 are unconstitutional.[2]

### 2.    Information Dissemination Provision

HEA 1337 also requires abortion providers to inform their patients "[t]hat Indiana does not allow a fetus to be aborted solely because of the fetus's race, color, national origin, ancestry, sex, or diagnosis or potential diagnosis of the fetus having Down syndrome or any other disability." Ind. Code § 16-34-2-1.1(a)(1)(K). Simply put, this provision requires abortion providers to inform patients of the anti-discrimination provisions discussed above.

PPINK maintains that requiring abortion providers to disseminate and patients to listen to this information violates their First Amendment rights regarding compelled speech and compelled listening, respectively. The State contends that PPINK's First Amendment claim is entirely derivative of its Fourteenth Amendment claim, in that success on PPINK's Fourteenth Amendment

---

[2] The State maintains that PPINK's challenge to the anti-discrimination provisions may be susceptible to an as-applied challenge but not to a facial challenge as a facial challenge requires PPINK to demonstrate that "'no set of circumstances exists under which the [challenged statute] would be valid.'" (Filing No. 54 at 30) (quoting *United States v. Salerno*, 481 U.S. 739 (1987))). The State is correct that a facial challenge requires the plaintiff to "establish that a law is unconstitutional in all of its applications." *City of Los Angeles, Cal. v. Patel*, 135 S. Ct. 2443, 2451 (2015). As the Supreme Court very recently made clear, "the relevant denominator" when applying this test is "those [women] for whom [the provision] is an actual rather than an irrelevant restriction." *Whole Woman's Health v. Hellerstedt*, --- S.Ct. ----, 2016 WL 3461560, at *28 (2016) (citation and quotation marks omitted). The anti-discrimination provisions prevent any woman who seeks to have a pre-viability abortion solely for one of the enumerated reasons from obtaining one. This is an irrelevant restriction for women not seeking an abortion solely for one of these reasons. It is, however, relevant to women seeking an abortion for one of the enumerated reasons, and it is very likely unconstitutional as to all of these women. As such, it is susceptible to a facial challenge.

claim necessarily means success on its First Amendment claim. This is because, in the State's view, the only requirement the First Amendment places on these types of regulations is that the information a physician must provide be truthful and non-misleading. Therefore, the State maintains that "[i]f . . . the Court concludes that the underlying prohibition against discriminatory abortion is unconstitutional, [it] must reluctantly concede that the required statement that such abortions are not allowed would become misleading." (Filing No. 54 at 34.)

Although PPINK does not agree that its First Amendment claim is entirely derivative of its Fourteenth Amendment claim, the parties agree that, if PPINK has a strong likelihood of success on its Fourteenth Amendment claim, it also has a strong likelihood of success on its First Amendment claim. This is because, even under the standard more favorable to the State, the State cannot compel abortion providers to provide false information; a state can only "use its regulatory authority to require a physician to provide truthful, non-misleading information relevant to a patient's decision to have an abortion." *Texas Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 576-77 (5th Cir. 2012) (quoting *Planned Parenthood Minn. v. Rounds*, 530 F.3d 724, 735 (8th Cir. 2008) (en banc)). Given the Court's conclusion that the anti-discrimination provisions very likely violate the Fourteenth Amendment, requiring abortion providers to inform their patients that the law prohibits abortions sought for those reasons would, therefore, require abortion providers to give their patients false information. Accordingly, PPINK has a strong likelihood of success on its First Amendment challenge to the information dissemination requirements.

### 3.     Fetal Tissue Disposition Provisions

PPINK's final challenge is to the new fetal tissue disposition provisions created by HEA 1337. PPINK contends that these requirements violate substantive due process and equal

protection principles.  Ultimately, the Court concludes that PPINK has a strong likelihood of success on its substantive due process claim and is entitled to an injunction on this basis alone. Therefore, the Court need not reach a conclusion on the equal protection claims.

The parties agree that the fetal tissue disposition provisions do not implicate a fundamental right.  When a fundamental right is not at stake, however, substantive due process still creates "a residual substantive limit on government action which prohibits arbitrary deprivations of liberty." *Hayden ex rel. A.H. v. Greensburg Community Sch. Corp.*, 743 F.3d 569, 576 (7th Cir. 2014).  A law will survive such a challenge if the State can "demonstrate that the intrusion upon . . . liberty is rationally related to a legitimate government interest."  *Id.*; *Charleston v. Bd. of Trustees of Univ. of Ill. at Chi.*, 741 F.3d 769, 774 (7th Cir. 2013) ("[s]ubstantive due process requires only that the practice be rationally related to a legitimate government interest, or alternatively phrased, that the practice be neither arbitrary nor irrational.").  It is ultimately the plaintiff's burden to demonstrate that the challenged law "lacks a rational relationship with a legitimate government interest; it is not the [government's] obligation to prove rationality with evidence."  *Hayden*, 743 F.3d at 576.  The plaintiff's burden is a "heavy one: So long as there is any conceivable state of facts that supports the policy, it passes muster under the due process clause; put another way, only if the policy is patently arbitrary would it fail."  *Id.*

The Court's analysis begins and ends with whether the State's asserted interest is legitimate.[3]  The State provides multiple formulations of the interest furthered by the fetal tissue

---

[3] The State contends that PPINK's substantive due process claim fails because it does not "articulate[] the precise right it seeks to vindicate," as there is "'no abstract right to substantive due process . . . under the Constitution.'"  (Filing No. 54 at 35 (quoting *Gen. Auto Serv. Station v. City of Chi.*, 526 F.3d 991, 1002 (7th Cir. 2008))).  But as PPINK points out, substantive due process protects against any arbitrary or irrational use of government power.  *See County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) ("[T]he substantive due process guarantee protects against government power arbitrarily and oppressively exercised."); *Hayden*, 743 F.3d at 576 ("[T]here is a residual substantive limit on government action which prohibits arbitrary deprivations of liberty.").  Moreover, the principle on which the State relies from *General Auto Service Station* does not apply here, as cases such as that involving an

dispositions provisions:  (1) "to treat fetal remains with the same dignity as other human remains," (Filing No. 54 at 35); (2) "promoting respect for human life by ensuring proper disposal of fetal remains," (Filing No. 54 at 36); and (3) ensuring "that fetal remains be treated with humane dignity," (Filing No. 54 at 38).  PPINK argues that these asserted interests are insufficient because the State has no legitimate interest in ensuring that abortion providers treat fetal tissue in the same manner as human remains.  Specifically, PPINK maintains that the State's asserted interest "stems from the legally indefensible assumption that embryonic and fetal tissue at any stage in the first trimester is a human being", and to accept this as a legitimate state interest "would require this Court to make a leap that the Supreme Court has refused to take to decide that human life begins at conception and that a fetus is a human being."  (Filing No. 57 at 11-12.)

As an initial matter, the Court must reject as legitimate, the State's first formulation of its asserted interest.  As the Seventh Circuit has noted, the Supreme Court and the cases that follow have unequivocally held that for purposes of the Fourteenth Amendment, a fetus is not a "person." *See Coe v. County of Cook*, 162 F.3d 491, 495 (7th Cir. 1998) (citing *Roe*, 410 U.S. at 158; *Casey*, 505 U.S. at 912 [Stevens, J., concurring]; *Reed v. Gardner*, 986 F.2d 1122, 1128 (7th Cir. 1993); *Alexander v. Whitman*, 114 F.3d 1392, 1400 (3d Cir. 1997); *Crumpton v. Gates*, 947 F.2d 1418, 1421 (9th Cir. 1991)).  As such, the Court can find no legal basis for the State to treat fetal remains with "the same" dignity as human remains.  Stated otherwise, if the law does not recognize a fetus as a person, there can be no legitimate state interest in treating an aborted fetus *the same* as a deceased human.

For similar reasons, the State's other two formulations of its asserted interest ultimately fare no better.  Although these formulations are not premised on a fetus being *the same* as a person,

---

alleged deprivation of a property right require the identification of a specific "protected property interest."  526 F.3d at 1002.

18

they are premised on the related principle that fetal tissue is entitled to a more respectful, dignified, or humane disposition because it, like human remains, in some sense represents life.  However, the State does not cite any legal authority that recognizes this premise as a legitimate state interest. Although the State points to Supreme Court cases that have recognized that the State has a legitimate interest in promoting respect for potential life, these precedents do not extend to situations such as this where the potentiality for human life no longer is present.

For example, the State relies on the Supreme Court's assertion in *Gonzales* that government "may use its voice and its regulatory authority to show its profound respect for the life within the woman."  *Gonzales*, 550 U.S. at 157; *see id.* at 163 (stating that the government has an "interest in promoting respect for human life at all stages in the pregnancy").  Similarly, in *Casey*, the Supreme Court recognized that "the State has legitimate interests from the outset of pregnancy in protecting the health of the woman and the life of the fetus that may become a child," and that there is "a substantial state interest in potential life throughout pregnancy."  505 U.S. at 846, 876.

The difficulty with the State's reliance on these state interests, as noted above, is that they are only recognized as legitimate during the "stages in the pregnancy," *Gonzales*, 550 U.S. at 163, as this is when there is a "potential life," *Casey*, 505 U.S. at 876.  As PPINK correctly points out, the Supreme Court's recognition that the government has a legitimate interest in potential life has not been extended by *Gonzales* nor any other case "to imposing procedures taken after the pregnancy has been terminated" like the fetal tissue disposition provisions do (Filing No. 57 at 13 n.8).  Not only do the legitimate state interests recognized by the Supreme Court not extend to the situation here, but the consistency with which the Supreme Court ties the legitimate interest to the potentiality of life.  This suggests that it would not extend these principles to this context where, following an abortion, such a potentiality is no longer present.

Absent a potential life, this Court would have to determine that fetal tissue is in some respects the equivalent of human remains for the State's interest to be legitimate.  This would be quite similar to a recognition that a fetus is a person, an affirmation which this Court is not allowed to make.  As explained by the Seventh Circuit, the conclusion in *Roe* that a fetus is not a person "follows inevitably from the decision to grant women a right to abort.  If even a first-trimester fetus is a person, surely the state would be allowed to protect him from being killed . . . ."  *Coe*, 162 F.3d at 495.  The fact that recognizing a fetus as a person would undermine the right to abortion itself lends further credence to PPINK's position that the Supreme Court has intentionally not extended the legitimate state interests recognized in *Gonzales* and other cases to situations where there is no longer a potential life.

Notably, courts that have upheld requirements regarding the disposition of fetal tissue have done so by recognizing a legitimate state interest in ensuring the sanitary disposal of fetal tissue.[4] *See, e.g.*, *Leigh v. Olson*, 497 F. Supp. 1340, 1351 (D.N.D. 1980) (recognizing that there is a legitimate state interest in regulating "the disposal of dead fetuses to protect the public health").  But the State does not attempt to justify the fetal tissue disposition provisions on this basis, likely because Indiana statutes already require that fetal tissue be disposed of in a sanitary manner.[5]

---

[4] A fetal tissue disposition statute was upheld in *Planned Parenthood of Minn. v. State of Minn.*, 910 F.2d 479 (8th Cir. 1990), but in that case the plaintiff "concede[d] the state has a legitimate interest in protecting public sensibilities." *Id.* at 488.  Not only was no similar concession made here, but the State's asserted legitimate interest is meaningfully different in this case.  For both of these reasons, the Eighth Circuit's decision is of no persuasive value here.

[5] The parties also dispute whether the Supreme Court's decision in *City of Akron v. Akron Ctr. for Reproductive Health, Inc.*, 462 U.S. 416 (1983), *overruled in part on other grounds by Casey*, 505 U.S. 833, answers whether the State's asserted interest is a legitimate one.  Specifically, the parties focus on a footnote in *City of Akron*, where the Supreme Court stated that, although the fetal tissue disposition statute was impermissibly vague for a statute imposing criminal penalties, the City of Akron "remain[ed] free, of course, to enact more carefully drawn regulations that further its legitimate interest in proper disposal of fetal remains." *Id.*  As an initial matter, this statement in a footnote certainly does not constitute a holding of the Supreme Court.  But perhaps more importantly, it is unclear from this statement whether by using the word "proper" the Supreme Court meant in a dignified manner or a sanitary manner.  After all, the statute that was struck down mandated the "humane and sanitary" disposition of fetuses.  Given that the issue and type of legal challenge in this case are substantially different than those in *City of Akron*, the Court declines to give a non-binding and opaque statement in a footnote controlling weight.

In sum, the Court can find no legal support for the State's position that it has a legitimate state interest in "promoting respect for human life by ensuring proper disposal of fetal remains," (Filing No. 54 at 36), or ensuring "that fetal remains be treated with humane dignity," (Filing No. 54 at 38).  The Supreme Court has made clear that a fetus is not legally a person, but the State's asserted interests are essentially that fetal tissue should be treated similarly to human remains because they are like human remains.  Although the Supreme Court has recognized a legitimate governmental interest in promoting the life of a fetus during a pregnancy, such an interest is always tethered to the notion that the fetus represents a potential life and the State can legitimately promote respect for that potentiality.  The Supreme Court has extended these principles no further than that, and the State has not provided a basis so that this Court can do otherwise.  Therefore, any legitimate interest the State has in a potential life during a pregnancy is no longer present once the pre-viability pregnancy is terminated; and thus, it does not have a legitimate state interest in treating fetal tissue similarly to human remains.

To be clear, whether or not an individual views fetal tissue as essentially the same as human remains is each person's own personal and *moral* decision.  *Cf. Roe*, 410 U.S. at 159 ("[w]hen those trained in the respective disciplines of medicine, philosophy, and theology are unable to arrive at any consensus, the judiciary, at this point in the development of man's knowledge, is not in a position to speculate as to the answer.).  The Court cannot resolve this moral question.  But as a *legal* question, there is currently no basis which would allow this Court to recognize fetal tissue as such.

Because "substantive due process requires [every law to] be rationally related to a legitimate government interest," *Charleston*, 741 F.3d at 774, and the fetal tissue disposition provisions further no legitimate interest, PPINK has a strong likelihood of success on its substantive due process claim.  Accordingly, the Court need not address PPINK's equal protection challenges to these provisions.

**B.      Irreparable Harm**

The second preliminary injunction factor requires PPINK to show "that it is likely to suffer irreparable harm in the absence of preliminary relief" as to each of the provisions it seeks to enjoin. *Grace Schools*, 801 F.3d at 795.  Each of the provisions will be addressed in turn.

First, with respect to PPINK's Fourteenth Amendment challenge to the anti-discrimination provisions, PPINK will clearly suffer irreparable harm if it is unconstitutionally prevented from providing abortions during the pendency of this litigation.  *See Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786, 796 (7th Cir. 2013).  At the very least, it is likely that, absent an injunction, PPINK would not be able to provide surgical abortions to some women facing the difficult moral and reproductive health decision of whether to terminate a pregnancy who would otherwise do so during the pendency of this litigation.  Second, the harm stemming from PPINK's related First Amendment challenge to the information dissemination provision is also irreparable. *See Christian Legal Soc'y v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006) ("[v]iolations of First Amendment rights are presumed to constitute irreparable injuries.").

Finally, as to PPINK's challenges to the fetal tissue disposition provisions, the Seventh Circuit has recognized that, "for some kinds of constitutional violations, irreparable harm is presumed." *Ezell v. City of Chi*, 651 F.3d 684, 699 (7th Cir. 2011).  Several judges in this district, including the undersigned, have concluded that this presumption of irreparable harm also applies

22

to equal protection violations. *See, e.g.*, *Baskin v. Bogan*, 983 F. Supp. 2d 1021, 1028 (S.D. Ind. 2014); *Planned Parenthood of Ind. and Ky. v. Comm'r, Ind. State Dep't of Health*, 984 F. Supp. 2d 912, 930 (S.D. Ind. 2013); *L.P. v. Comm'r, Ind. State Dep't of Health*, 2011 WL 255807, at *4 (S.D. Ind. 2011). Specifically, the undersigned recently held that the reasoning in *Ezell* regarding whether a violation of one's Second Amendment rights creates irreparable harm is equally applicable to violations of one's equal protection rights. *See Exodus Refugee Immigration, Inc. v. Pence*, Case No. 1:15-cv-01858-TWP-DKL, 2016 WL 772897, at *14 (S.D. Ind. Feb. 29, 2016). This is because, like the First and Second Amendment, violations of equal protection and, here, substantive due process, "'protect[] similarly intangible and unquantifiable interests.'" *Id.* (quoting *Ezell*, 651 F.3d at 699).

The presumption of irreparable harm is applicable here. If PPINK is ultimately successful on its substantive due process challenge to the fetal tissue disposition provisions, the harm stemming from that violation is presumed irreparable. The State appears to recognize this when it acknowledges that "PPINK can establish irreparable harm only to the extent it establishes likely success on its constitutional claims." (Filing No. 54 at 41.)

Accordingly, PPINK has made the necessary showing that it will suffer some measure of irreparable harm in the absence of an injunction as to all the challenged provisions of HEA 1337.

C.    **Balance of Harms, Public Policy Considerations, and Sliding Scale Analysis**

To obtain a preliminary injunction, the moving party must show that its case has some likelihood of success on the merits and that it has no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied. *Stuller,* 695 F.3d at 678. For the reasons stated above, PPINK has made these showings with respect to all of its claims. "If the moving party meets these threshold requirements, the district court 'must consider the irreparable harm

that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied.'" *Id.* (quoting *Ty,* 237 F.3d at 895). "The district court must also consider the public interest in granting or denying an injunction." *Id.*

After addressing these considerations, the Court "weighs the balance of potential harms on a 'sliding scale' against the movant's likelihood of success: the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor." *Turnell*, 796 F.3d at 662. The Court will first address the balance of harms and public interest considerations before engaging in the sliding scale analysis of the balance of harms as compared to PPINK's likelihood of success on the merits of each of its claims. Notably, the parties' briefing regarding these factors is very limited.

### 1.    Anti-Discrimination and Information Dissemination Provisions

PPINK maintains that it and its patients will suffer significant harm absent an injunction of the anti-discrimination and information dissemination provisions. Specifically, it maintains that the former will prevent numerous women from obtaining an abortion in which they have a constitutional right to obtain, and the latter will cause women to be unconstitutionally and falsely informed that they cannot obtain an abortion for certain reasons. Against these harms, the State maintains that the injunction of a democratically enacted law "'has the cost of diminishing the scope of democratic governance.'" (Filing No. 54 at 42) (quoting *Illinois Bell Tele. Co. v. WorldCom Tech., Inc.*, 157 F.3d 500, 503 (7th Cir. 1998)). Moreover, the State contends that the anti-discrimination and information dissemination provisions "serve[] the public interest by furthering the State's interests in protecting all human life and preventing discrimination," and to enjoin these laws would prevent the State from accomplishing these goals (Filing No. 54 at 42).

24

Although the statistical evidence regarding how many women seek an abortion *solely* for one of the enumerated reasons is far from comprehensive or uniform, the parties are essentially in agreement that a significant number of women have sought and will seek an abortion solely because to the diagnosis or potential diagnosis of a disability.  (*See, e.g.*, Filing No. 30-1 at 2-3) (attestation from the CEO of PPINK that it has and will continue to provide abortions to women who seek an abortion "solely because of a diagnosis of fetal Down syndrome or other genetic disabilities or the possibility of such a diagnosis"); Filing No. 54 at 14-15 (citing statistics regarding the percentage of fetuses diagnosed with Down syndrome that are aborted)).  Absent an injunction of the anti-discrimination provisions, women who seek such an abortion will be unable to obtain one in Indiana.  And absent an injunction of the information dissemination provision, abortion providers will be required to inform their patients that they are unable to obtain an abortion solely because of one of the enumerated reasons even though such a restriction is likely unconstitutional.

The harms faced by PPINK and its patients are substantial, irreparable, and significant. Difficult moral and complicated health decisions are made by women whose pregnancies are affected by a prenatal fetal anomaly. Given the relatively short timeframe in which women may elect to terminate a pregnancy, even a short disruption of a woman's ability to do so could have significant consequences.  Given this, the harm flowing from the information dissemination provision is similarly severe.  Absent an injunction, women would be informed that there could be legal consequences if they choose to terminate a pregnancy for these particular reasons, which could impair a woman's ability to make her decision with "intimate views" and "with infinite variations." *Casey* at 853. These harms far outweigh the generalized harms faced by the State in the delay of the implementation of its democratically enacted law. *See Van Hollen*, 738 F.3d at

796 ("[i]t is beyond dispute that the plaintiffs face greater harm irreparable by the entry of a final judgment in their favor than the irreparable harm that the state faces if the implementation of its statute is delayed.  For if forced to comply with the statute, only later to be vindicated when a final judgment is entered, the plaintiffs will incur in the interim the disruption of the services that the abortion clinics provide.").

Furthermore, the public interest would be served by enjoining these provisions as the vindication of constitutional rights serves the public interest.  *See Joelner v. Vill. of Washington Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004) ("[s]urely, upholding constitutional rights serves the public interest.") (quoting *Newsom v. Albemarle County Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003)); *see also Preston*, 589 F.2d at 303 n.3 ("[t]he existence of a continuing constitutional violation constitutes proof of an irreparable harm, and its remedy certainly would serve the public interest.").  Although the State is undoubtedly correct that the public interest is served as a general matter by eliminating discrimination in our society, the injunction here seeks to ensure that the State does not do so in a way that very likely violates the Constitution, which is in the public interest.

Having examined all of the relevant factors, the Court must "weigh[] the balance of potential harms on a 'sliding scale' against the movant's likelihood of success:  the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor."  *Turnell*, 796 F.3d at 662.  As to the anti-discrimination and information dissemination provisions, the sliding scale analysis is straightforward:  PPINK is very likely to succeed on its challenges to these provisions and the balance of harms weigh heavily in its favor.  Accordingly, it is clear that PPINK is entitled to a preliminary injunction prohibiting the

enforcement of the anti-discrimination and information dissemination provisions pending the resolution of this litigation.

2.    **Fetal Tissue Disposition Provisions**

The Court turns next to the fetal tissue disposition provisions.  In arguing that the balance of harms weighs in its favor, PPINK primarily relies on the presumed harm that flows from a substantive due process violation discussed above.  The State, for its part, focuses on the same harm discussed above regarding the cost of enjoining democratically enacted laws, as well how an injunction will prevent the State from providing enhanced dignity to fetal tissue that the State believes is warranted.  Lastly, the parties dispute how the Court should weigh the financial harm the fetal tissue disposition provisions will cause PPINK.

The Court views the parties' generalized harms as essentially equal.  PPINK is correct that there is a certain level of irreparable harm that flows from every constitutional violation, yet the State is correct that it has a legitimate interest in enforcing democratically enacted laws.  As to the financial impact these provisions will have on PPINK, the evidence reveals that they will increase the annual cost of disposing fetal tissue from its current level. (Filing No. 57-2 at 3-4).  Although not an overwhelming sum, it will undoubtedly have a financial impact on PPINK and possibly its patients.  Given this, the balance of harms weighs slightly in PPINK's favor.[6]  Moreover, as to the public interest considerations, for the same reasons discussed above, these considerations do not preclude an injunction given that the fetal tissue disposition provisions are likely unconstitutional. *See Joelner*, 378 F.3d at 620.

---

[6] Given the Court's ultimate weighing of the factors, the Court need not resolve whether the financial harm to PPINK is irreparable.  (*See* Filing No. 57 at 17 (arguing that the financial harm is irreparable because the State is "protected from damages liability by the Eleventh Amendment")).  Even if it is not, PPINK would be entitled to a preliminary injunction.

With the foregoing analysis in mind, the Court must again "weigh[] the balance of potential harms on a 'sliding scale' against the movant's likelihood of success:  the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor."  *Turnell*, 796 F.3d at 662.  The sliding scale analysis is more difficult with respect to the fetal tissue disposition provisions than it is regarding the other two challenged provisions.  Critical to the Court's analysis is the Seventh Circuit's reminder that "[t]he sliding scale approach is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief."  *Stuller,* 695 F.3d at 678 (citation and internal quotation marks omitted). "Stated another way, the district court 'sit[s] as would a chancellor in equity' and weighs all the factors, 'seeking at all times to minimize the costs of being mistaken.'"  *Id*. (quoting *Abbott Labs*., 971 F.2d at 12).

That said, PPINK is likely to succeed on its substantive due process challenge to the fetal tissue disposition provisions and the balance of harms weighs, albeit slightly, in its favor.  Given PPINK's likelihood of success, it does not need the balance of harms to weigh in its favor in order to be entitled to an injunction.  But it does.  Accordingly, it is clear that PPINK is entitled to a preliminary injunction prohibiting the enforcement of the fetal tissue disposition provisions pending the resolution of this litigation.

In sum, the Court has "weigh[ed] all the factors" and sought "at all times to minimize the costs of being mistaken.'"  *Stuller*, 695 F.3d at 678.  It has done so in light of the Supreme Court's warning that "injunctive relief is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 376.  Nevertheless, PPINK has demonstrated that it is entitled to the injunction it seeks.

## IV.    CONCLUSION

The United States Supreme Court has stated in categorical terms that a state may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability. It is clear and undisputed that until *Roe v. Wade* and *Planned Parenthood of Se. Pa. v. Casey* are overturned by the United States Supreme Court, this Court is bound to follow that precedent under the rule of *stare decisis*. *See Casey,* 505 U.S. at 870, 112 S.Ct. 2791 (stating that the doctrine of *stare decisis* requires reaffirmance of *Roe's* essential holding recognizing a woman's right to choose an abortion before fetal viability); *MKB Mgmt. Corp. v. Burdick*, 954 F. Supp. 2d 900 (D. N.D. 2013) ("[n]o judge in the United States can overrule *Roe v. Wade*; only the Supreme Court can do so"); *Sojourner v. Roemer*, 772 F. Supp. 930, 932 (E.D. La. 1991).

PPINK has clearly demonstrated that the anti-discrimination provisions and the information dissemination provision should be enjoined pending resolution of this litigation.  It is likely to succeed on the merits of its challenges to these provisions as the anti-discrimination provisions directly contravene well-established law that precludes a state from prohibiting a woman from electing to have an abortion prior to fetal viability.  Similarly, the information dissemination provision is likely unconstitutional as it requires abortion providers to convey false information regarding the anti-discrimination provisions to their patients.  PPINK faces irreparable harm of a significantly greater magnitude if these provisions are not enjoined than that faced by the State.

Second, PPINK has persuasively shown that the fetal tissue disposition provisions do not further a legitimate state interest and thus are likely unconstitutional.  This, when combined with the fact that the balance of harms weighs slightly in PPINK's favor, leads to the conclusion that PPINK is also entitled to an injunction with respect to these provisions.

29

Accordingly, PPINK's Motion for Preliminary Injunction is **GRANTED**. (Filing No. 7.) Pursuant to Federal Rule of Civil Procedure 65(d), the Court **ISSUES A PRELIMINARY INJUNCTION** prohibiting the State from enforcing the following provisions of HEA 1337: the anti-discrimination provisions, Indiana Code §§ 16-34-4-4, 16-34-4-5, 16-34-4-6, 16-34-4-7, 16-34-4-8, the information dissemination provision, Indiana Code § 16-34-2-1.1(a)(1)(K), and the fetal tissue disposition provisions. Because the State has not disputed PPINK's position that the State will not incur monetary damages from an injunction, PPINK need not post a bond.

**SO ORDERED.**

Date: 6/30/2016

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Gavin M. Rose
ACLU OF INDIANA
grose@aclu-in.or

Helene T. Krasnoff
PLANNED PARENTHOOD FEDERATION OF AMERICA
Helene.krasnoff@ppfa.org

Jan P. Mensz
ACLU OF INDIANA
jmensz@aclu-in.org

Jennifer Dalven
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
jdalven@aclu.org

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

Heather Hagan McVeigh
OFFICE OF THE INDIANA ATTORNEY GENERAL
heather.mcveigh@atg.in.gov

Kenneth Biggins, Jr.
OFFICE OF THE INDIANA ATTORNEY GENERAL
kenneth.biggins@atg.in.gov

Lara K. Langeneckert
OFFICE OF THE INDIANA ATTORNEY GENERAL
lara.langeneckert@atg.in.gov

Thomas M. Fisher
OFFICE OF THE INDIANA ATTORNEY GENERAL
tom.fisher@atg.in.gov