| | | |
|---|---|---|
| PLANNED PARENTHOOD OF INDIANA AND KENTUCKY, INC., and CAROL DELLINGER M.D., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:16-cv-00763-TWP-DML |
| COMMISSIONER, INDIANA STATE DEPARTMENT OF HEALTH in his official capacity, PROSECUTORS OF MARION, LAKE, MONROE, AND TIPPECANOE COUNTIES in their official capacities, and THE INDIVIDUAL MEMBERS OF THE MEDICAL LICENSING BOARD OF INDIANA in their official capacities, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This matter is before the Court on cross-motions for summary judgment filed by Plaintiffs

Planned Parenthood of Indiana and Kentucky and Carol Dellinger, M.D. (collectively, "PPINK"),

([Filing No. 73](#)), and Defendants the Commissioner of the Indiana State Department of Health

("ISDH"), the Prosecutors of Marion, Lake, Monroe, and Tippecanoe Counties, and members of

the Medical Licensing Board of Indiana (collectively, "the State"), all in their official capacities,

([Filing No. 75](#)).

On March 24, 2016, House Enrolled Act No. 1337 ("HEA 1337"), which creates new

regulations of abortion and practices related to abortion, was signed into law. PPINK maintains

that several provisions of HEA 1337 are unconstitutional. PPINK seeks to permanently enjoin the

implementation and enforcement of these provisions, and a declaratory judgment that the

challenged provisions are unconstitutional. For the reasons that follow, the Court concludes that

the challenged provisions violate the Fourteenth Amendment to the United States Constitution and permanently enjoins enforcement of these provisions.

## I. BACKGROUND

PPINK is a non-profit healthcare provider which offers reproductive healthcare, family planning, and preventive primary-care services. (Filing No. 30-1 at 1.) At the outset of this case, it operated twenty-three health centers in Indiana and two in Kentucky. (Filing No. 30-1 at 1.) Three of the Indiana health centers, located in Bloomington, Merrillville, and Indianapolis, provide surgical abortion services to patients. (Filing No. 30-1 at 1.) Surgical abortions are available at these centers only through the first trimester of pregnancy. (Filing No. 30-1 at 1.)

On March 24, 2016, the Governor of Indiana signed into law HEA 1337, which would have become effective on July 1, 2016. *See* Ind. Code § 16-34-4-1 *et seq.* HEA 1337 creates several new provisions and amends several others regarding Indiana's regulation of abortion and practices related to abortions. *See id.* Three aspects of HEA 1337 are challenged by PPINK in this action. The parties essentially do not dispute the key background facts related to the challenged provisions, nor do they dispute the potential consequences of these provisions for PPINK and its patients. The Court will therefore only briefly set forth the challenged provisions and summarize the background evidence related to each provision.

### A. Anti-Discrimination and Information Dissemination Provisions

HEA 1337 creates Indiana Code § 16-34-4, and is entitled "Sex Selective and Disability Abortion Ban." This chapter bans abortions sought solely for certain enumerated reasons. Specifically, HEA 1337 provides that "[a] person may not intentionally perform or attempt to perform an abortion before the earlier of viability of the fetus or twenty (20) weeks of postfertilization age if the person knows that the pregnant woman is seeking" an abortion: (1) "solely because of the sex of the fetus," §§ 16-34-4-4, 16-34-4-5; (2) "solely because the fetus has

been diagnosed with, or has a potential diagnosis of, Down syndrome or any other disability," §§ 16-34-4-6, 16-34-4-7; or (3) "solely because of the race, color, national origin, or ancestry of the fetus," § 16-34-4-8. The phrase "potential diagnosis" is defined as "the presence of some risk factors that indicate that a health problem may occur." Ind. Code § 16-34-4-3. Moreover, HEA 1337 requires abortion providers to complete a form provided by ISDH that indicates, among other things, the "gender of the fetus, if detectable," and "[w]hether the fetus has been diagnosed with or has a potential diagnosis of having Down syndrome or any other disability." Ind. Code § 16-34-2-5(a)(6).

Indiana law sets forth consequences for abortion providers who violate these provisions. Currently, it is a felony to knowingly or intentionally perform an abortion that is not permitted by Indiana law, and HEA 1337 does not change this. *See* Ind. Code § 16-34-2-7(a). Moreover, HEA 1337 provides that "[a] person who knowingly or intentionally performs an abortion in violation of this chapter may be subject to: (1) disciplinary sanctions under IC 25-1-9; and (2) civil liability for wrongful death." Ind. Code § 16-34-4-9(a).

Not only does HEA 1337 preclude abortions sought solely for one of the enumerated reasons, but the associated information dissemination provision requires abortion providers to inform their patients of the anti-discrimination provisions. Specifically, abortion providers must inform their patients "[t]hat Indiana does not allow a fetus to be aborted solely because of the fetus's race, color, national origin, ancestry, sex, or diagnosis or potential diagnosis of the fetus having Down syndrome or any other disability." Ind. Code § 16-34-2-1.1(a)(1)(K).

The State presents evidence that these provisions were passed in light of technological developments that allow the diagnosis or potential diagnosis of fetal disabilities to be made early in a pregnancy. In particular, cell-free fetal DNA testing is able to screen for several genetic

abnormalities, including Down syndrome, as early as ten weeks into the pregnancy. (Filing No. 54-1 at 5.) Tests such as the cell-free fetal DNA test are screening tests rather than diagnostic tests, and as such, only reveal the likelihood of genetic abnormality. (Filing No. 54-1 at 4.)

The parties are essentially in agreement that a significant number of women have sought, and will continue to seek, an abortion solely because of the diagnosis of a disability or the risk thereof. (*See, e.g.,* Filing No. 30-1 at 2-3 (attestation from the CEO of PPINK that it has and will continue to provide abortions to women who seek an abortion "solely because of a diagnosis of fetal Down syndrome or other genetic disabilities or the possibility of such a diagnosis"); Filing No. 54 at 14-15 (citing statistics regarding the percentage of fetuses diagnosed with Down syndrome that are aborted)). Moreover, the parties agree that the number of women who will seek an abortion at least in part out of these concerns will likely increase as testing is more widely available than ever before.

**B.      Fetal Tissue Disposition Provisions**

HEA 1337 also changes the manner in which fetal tissue must be disposed. Under current Indiana law, prior to the passage of HEA 1337, "[a] pregnant woman who has an abortion ... has the right to determine the final disposition of the aborted fetus." Ind. Code § 16-34-3-2. If the woman decides to let the facility performing the abortion dispose of the fetal tissue, Indiana regulations require that the facility bury or cremate the fetal tissue. *See* 410 I.A.C. § 35-2-1(a). Currently, if a medical facility elects to cremate fetal tissue, it must do so by using a "crematory" or by "incineration as authorized for infectious and pathological waste." 410 I.A.C. § 35-1-3. Pathological waste includes tissues, organs, body parts, and blood or bodily fluid "that are removed during surgery, biopsy, or autopsy." Ind. Code § 16-41-16-5. Infectious waste includes pathological waste, Ind. Code § 16-41-6-4(b), and it can be destroyed through various procedures

including incineration, Ind. Code § 16-41-6-3(b). Therefore, as it currently stands, the woman can determine to bury, cremate, or otherwise dispose of the fetal tissue herself, or the fetal tissue may be incinerated along with other human surgical byproducts such as organs. PPINK currently utilizes a contractor who periodically incinerates the fetal tissue along with other surgical by-products.

HEA 1337 alters the manner in which healthcare providers must handle fetal tissue in instances where the patient does not elect to retain it and dispose of it herself. It provides that "[a]n abortion clinic or health care facility having possession of an aborted fetus shall provide for the final disposition of the aborted fetus. The burial transit permit requirements of IC 16-37-3 apply to the final disposition of an aborted fetus, which must be interred or cremated." Ind. Code § 16-34-3-4(a).[1] A "burial transit permit" is "a permit for the transportation and disposition of a dead human body required under IC 16-37-3-10 or IC 16-37-3-12." Ind. Code § 23-14-31-5.

Moreover, HEA 1337 excludes "an aborted fetus or a miscarried fetus" from the definition of "infectious waste." Ind. Code § 16-41-16-4(d). This means that if a healthcare provider elects to use cremation rather than interment, the cremation of the fetal tissue must be performed at a crematory. However, the cremation of fetal tissue need not each be performed separately; HEA 1337 explicitly provides that "[a]borted fetuses may be cremated by simultaneous cremation." Ind. Code § 16-34-3-4(a). In exploring compliance with these new provisions, PPINK has been informed by the ISDH that its plan to aggregate "the products of conception in a container suitable for cremation and then, periodically, [have] the container delivered to a crematorium for final disposition" will comply with the statute. (Filing No. 54-10 at 2.)

---

[1] PPINK notes in its Amended Complaint that the same disposition requirements apply to fetal tissue that results from a miscarriage when that tissue is removed by an abortion clinic. (Filing No. 83 at 2.)

### C.    <u>Procedural History</u>

In the operative Second Amended Complaint, PPINK maintains that several provisions of HEA 1337 are unconstitutional, and it seeks to permanently enjoin the implementation and enforcement of these provisions. ([Filing No. 83 at 11](#).) PPINK also seeks a declaratory judgment that HEA 1337 is unconstitutional to the extent that it:

> (a) Denies the ability of a woman to obtain an abortion during the first trimester of her pregnancy for the reasons noted in Ind. Code § 16-34-4-5 through Ind. Code § 16-34-4-8;
>
> (b) Requires as part of the "informed consent" process that women seeking abortions be informed that they are unable to obtain an abortion if their sole reason for doing so is because of the fetus's race, color, national origin, ancestry, sex, or diagnosis or potential diagnosis of the fetus having a disability; and
>
> (c) Requires fetal tissue after a first trimester abortion or a miscarriage to be treated by the abortion provider differently than other medical material.

([Filing No. 83 at 11](#)). Following extensive briefing and oral argument, the Court granted PPINK's Motion for Preliminary Injunction, ([Filing No. 7](#)), concluding that PPINK was likely to succeed on the merits of its claims, ([Filing No. 62](#)).

PPINK and the State have cross-moved for summary judgment. ([Filing No. 73](#); [Filing No. 75](#).) Those motions are now fully briefed and ripe for the Court's review.

## II. <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the court reviews the record in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *Zerante,* 555 F.3d at 584; *Anderson,* 477 U.S. at 255.

The party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion, and identifying "the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any," which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (noting that when the non-movant has the burden of proof on a substantive issue, specific forms of evidence are not required to negate a non-movant's claims in the movant's summary judgment motion, and that a court may grant such a motion, "so long as whatever is before the district court demonstrates that the standard...is satisfied"); *see also* Fed. R. Civ. P. 56(c)(1)(A) (noting additional forms of evidence used in support or defense of a summary judgment motion, including "depositions, documents electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials").

Thereafter, a nonmoving party who bears the burden of proof on a substantive issue may not rest on its pleadings, but must affirmatively demonstrate by specific factual allegations that there is a genuine issue of material fact that requires trial. *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Celotex Corp.*, 477 U.S. at 323-24; Fed. R. Civ. P. 56(c)(1). Neither the mere existence of some alleged factual dispute between the parties nor the existence of some "metaphysical doubt" as to the material facts is sufficient to defeat a motion for summary judgment. *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997); *Anderson*, 477 U.S. at 247-48; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which [it] relies." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008).

Similarly, a court is not permitted to conduct a paper trial on the merits of a claim and may not use summary judgment as a vehicle for resolving factual disputes. *Ritchie v. Glidden Co., ICI*

*Paints World-Grp.*, 242 F.3d 713, 723 (7th Cir. 2001); *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Indeed, a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (highlighting that "these are jobs for a factfinder"); *Hemsworth*, 476 F.3d at 490. When ruling on a summary judgment motion, a court's responsibility is to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial. *Id.*

### III. DISCUSSION

The Court previously addressed all issues presented in this litigation in the Order preliminarily enjoining enforcement of the challenged sections of HEA 1337. (Filing No. 61.) Upon review of the parties' summary judgment briefing, a completely developed factual record, and the applicable legal authorities, the Court's view of the appropriate final determination of these issues remains unchanged. Drawing substantially from the Court's prior Order, (Filing No. 61), significant portions of which are incorporated herein, the Court modifies and extends that analysis only to the extent necessitated by the parties' additional arguments.

### A. Anti-Discrimination Provisions

PPINK contends that the anti-discrimination provisions clearly violate well-established Supreme Court precedent in that they prohibit women from obtaining an abortion prior to fetal viability. (Filing No. 74 at 2.) The State posits that HEA 1337 represents a "qualitatively new kind of [abortion] statute," and, as such, it argues that the Supreme Court precedents on which PPINK relies do not address, and therefore do not govern, the constitutionality of these provisions. (Filing No. 76 at 11.)

"It is a constitutional liberty of the woman to have some freedom to terminate her pregnancy." *Planned Parenthood v. Casey*, 505 U.S. 833, 846 (1992). This right is grounded in the right to privacy rooted in "the Fourteenth Amendment's concept of personal liberty." *Roe v.*

*Wade*, 410 U.S. 113, 153 (1973); *see Casey*, 505 U.S. at 846 ("Constitutional protection of the woman's decision to terminate her pregnancy derives from the Due Process Clause of the Fourteenth Amendment"). This right was first articulated in *Roe* but has since been repeatedly re-examined by the Supreme Court. Despite the Supreme Court's frequent revisiting of the issue, certain core principles have essentially remained unchanged since *Casey*, where a plurality of the Supreme Court reaffirmed *Roe*'s essential holding. *Casey*, 505 U.S. at 846. The essential holding of *Roe* has three parts:

> First is a recognition of the right of the woman to choose to terminate a pregnancy before viability and to obtain it without undue interference from the State. Before viability, the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure. Second is a confirmation of the State's power to restrict abortions after fetal viability, if the law contains exceptions for pregnancies which endanger the woman" life or health. And third is the principle that the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child.

*Casey*, 505 U.S. at 846.[2]

The anti-discrimination provisions of HEA 1337 clearly violate the first of these principles, in that they prevent women from obtaining abortions before fetal viability. The woman's right to choose to terminate a pregnancy pre-viability is categorical: "a State may not prohibit any woman

---

[2] Although a plurality of the justices articulated these principles in *Casey*, subsequent Supreme Court decisions have recognized and applied these principles when considering challenges to abortion laws. *See Gonzales v. Carhart*, 550 U.S. 124, 145-46 (2007); *Stenberg v. Carhart*, 530 U.S. 914, 920, 120 (2000). In *Stenberg*, for example, a majority of the Supreme Court characterized these principles as "established" and applied them as such to Nebraska's partial birth abortion ban. 530 U.S. at 921. More recently, in *Gonzales*, the Supreme Court only "assume[d]" that these principles governed. 550 U.S. at 146. Nevertheless, federal courts have recognized that this assumption merely signaled that the Supreme Court may be open to re-evaluating those principles in the future, not that those principles no longer represented the governing law. *See, e.g.*, *MKB Management Corp. v. Stenehjem*, 795 F.3d 768, 772 (8th Cir. 2015) (acknowledging that in *Gonzales* the Supreme Court only "assume[d]" *Casey*'s principles governed, but reasoning that "[e]ven so, the [Supreme Court] has yet to overrule the *Roe* and *Casey* line of cases. Thus we, as an intermediate court, are bound by those decision."). Indeed, the Seventh Circuit has treated these principles as binding precedent. *See Planned Parenthood of Ind., Inc. v. Commissioner of Ind. State Dep't of Health*, 699 F.3d 962, 987 (7th Cir. 2012). Perhaps because of this, the parties do not dispute that the principles articulated in *Casey* and subsequently applied in *Stenberg* and *Gonzales* constitute binding precedent.

from making the ultimate decision to terminate her pregnancy before viability." *Casey*, 505 U.S. at 870, 879 ("Before [viability] the woman has a right to choose to terminate her pregnancy."); *Stenberg*, 530 U.S. at 920 (same); *Gonzales*, 550 U.S. at 146 (same). As stated by the Seventh Circuit, "the constitutional right to obtain an abortion is a right against coercive governmental burdens; the government may not 'prohibit any woman from making the ultimate decision to terminate her pregnancy' before fetal viability." *Planned Parenthood of Ind.*, 699 F.3d at 987 (7th Cir. 2012) (quoting *Casey*, 505 U.S. at 874, 879).

Given the categorical nature of this principle, circuit courts have consistently held that any type of outright ban on pre-viability abortions is unconstitutional. *See MKB Management Corp.*, 795 F.3d at 773 (holding that a state law was unconstitutional because "we are bound by Supreme Court precedent holding that states may not prohibit pre-viability abortions" and the challenged law "generally prohibits abortions before viability"); *McCormack v. Herzog*, 788 F.3d 1017, 1029 (9th Cir. 2015) (holding that a state law was unconstitutional because its "broad[ ] effect ... is a categorical ban on *all* abortions between twenty weeks gestational age and viability," which "is directly contrary to the [Supreme] Court's central holding in *Casey* that a woman has the right to 'choose to terminate a pregnancy *before viability* and to obtain it without undue interference from the State' ") (quoting *Casey*, 505 U.S. at 846).

Nevertheless, the State attempts to accomplish via HEA 1337 precisely what the Supreme Court has held is impermissible. The anti-discrimination provisions prohibit a woman from choosing to terminate a pregnancy pre-viability if the abortion is sought solely for one of the enumerated reasons. For this Court to hold such a law constitutional would require it to recognize an exception where none have previously been recognized. Indeed, the State has not cited a single case where a court has recognized an exception to the Supreme Court's categorical rule that a

woman can choose to terminate a pregnancy before viability. This is unsurprising given that it is a woman's right to *choose* an abortion that is protected, which, of course, leaves no room for the State to examine, let alone prohibit, the basis or bases upon which a woman makes her choice. *See Casey*, 505 U.S. at 846 (stating that it is a woman's "*decision* to terminate her pregnancy" that is protected by the Fourteenth Amendment) (emphasis added); *id.* at 879 ("A State may not prohibit any woman from *making the ultimate decision* to terminate her pregnancy before viability.") (emphasis added).

The State resists this conclusion on multiple bases. First, the State casts the anti-discrimination provisions as the next iteration of our society's prohibition on discrimination. The State points to technological advances allowing earlier and more accurate information regarding whether a fetus has a diagnosis or potential diagnosis of Down syndrome or other disabilities. These technological advances, says the State, have led in part to an increase in the number of abortions sought for reasons related to those disabilities. Because the Supreme Court has recognized that the State has a legitimate interest in protecting potential life even from the outset of a pregnancy, the State maintains that the anti-discrimination provisions simply further its interest in protecting the potential life from discrimination.

The State is correct that the Supreme Court has consistently recognized that "the State has legitimate interests from the outset of the pregnancy in protecting ... the life of the fetus that may become a child." *Casey*, 505 U.S. at 846. But while this is true, the State simply ignores that the Supreme Court in *Casey* "struck a balance" between this interest and a woman's liberty interest in obtaining an abortion. *Gonzales*, 550 U.S. at 146. These interests weigh differently depending on whether the fetus is viable. Before viability, the Supreme Court made clear that "the State's interests are not strong enough to support a prohibition of abortion." *Casey*, 505 U.S. at 846, 869,

("[a]t a later point in fetal development,"—namely, viability—"the State's interest in life has sufficient force so that the right of the woman to terminate the pregnancy can be restricted.").

Therefore, although the State's interest in protecting and even promoting potential life is a legitimate one, the Supreme Court has already weighed this interest against a woman's liberty interest in choosing to terminate a pregnancy and concluded that, prior to viability, the woman's right trumps the State's interest. This is the "central holding" of *Roe*, and the State's position would require this Court to undermine that holding, which of course it cannot do. *See Stenehjem*, 795 F.3d at 772 ("[t]he [Supreme Court] has yet to overrule the *Roe* and *Casey* line of cases," and thus all federal courts "are bound by those decisions"). Accordingly, the State's focus on the technological developments since *Roe* and *Casey* are unpersuasive, and indeed irrelevant. This case is not about technological developments, but rather about a woman's liberty interest weighed against the State's interest in potential life. Developments in technology related to disability screening and the consequences that flow from those developments do not give this Court license to reevaluate the Supreme Court's judgment as to the balancing of these interests.

Second, the State advances a so-called "binary choice" interpretation of *Roe* and *Casey*, which, if accepted, would support the State's position that "HEA 1337 does not interfere with a right protected by *Roe* and *Casey*." (Filing No. 76 at 26.) The State's argument begins with the woman's liberty interest as articulated in *Casey*: "the right of the *individual* ... to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether *to bear or beget a child*." (Filing No. 76 at 26, citing *Casey*, 505 U.S. at 851 (emphasis added)). According to the State,

> both the woman's rights and the State's interests are different if the pregnant woman decides she wants a baby generally, but not the particular baby she happens to be carrying. A woman has already decided to bear a child. Although her privacy

and liberty interests have not completely evaporated, those rights are not as central as they once were.

([Filing No. 76 at 26](#)).

The difficulty with the State's position is that there is nothing in *Roe* or *Casey* that limits the right to terminate a pregnancy pre-viability to women who do not want to have a child *ever* as opposed to those who do not want to see a particular pregnancy through to birth. The quote from *Casey* on which the State relies certainly does not establish that a woman's right to decide whether to bear a child refers to the decision to have a child generally, rather than whether to continue a specific pregnancy. And the State does not cite a single legal authority that has recognized its binary choice theory or its proffered interpretation of *Roe* or *Casey*.

The lack of authority supporting the State's position likely stems from the fact that it is contrary to the core legal rights on which a woman's right to choose to terminate her pregnancy prior to viability are predicated. The Supreme Court has mandated that this right stems from a liberty right protected by the Fourteenth Amendment—specifically, a woman's right to *privacy*. *See Roe*, 410 U.S. at 153. Such a right "includes the interest in independence in making certain kinds of important decisions," such as whether to terminate a pregnancy. *Casey*, 505 U.S. at 859 (citation and quotation marks omitted). PPINK's claim is based on an infringement of this privacy right—the woman's right to make the important, personal, and difficult decision of whether to terminate her pregnancy. As stated above, the Supreme Court has weighed this right against the State's interest in protecting potential life and determined that the woman's privacy right—although "not ... unlimited"—is strong enough pre-viability to preclude the State from preventing her "from making the ultimate decision to terminate her pregnancy before viability." *Id.* at 879.

Under the State's theory, a woman either wants to have a child or does not; and, once a woman chooses the former, she cannot then terminate her pregnancy for reasons, whatever they

13

may be, that the State deems improper. But the very notion that, pre-viability, a State can examine the basis for a woman's choice to make this private, personal and difficult decision, if she at some point earlier decided she wants a child as a general matter, is inconsistent with the notion of a right rooted in privacy concerns and a liberty right to make independent decisions. The State's theory is also contrary to the reality that the decision to terminate a pregnancy involves "intimate views with infinite variations." *Id.* at 853.

To summarize, nothing in *Roe*, *Casey*, or any other subsequent Supreme Court decisions suggests that a woman's right to choose an abortion prior to viability can be restricted if exercised for a particular reason determined by the State. The right to a pre-viability abortion is categorical. Indeed, the Seventh Circuit has described "the mother's right to abort a fetus that has not yet become viable [as] essentially absolute." *Coe v. County of Cook*, 162 F.3d 491, 493 (7th Cir. 1998). This is because, despite the State's legitimate interest in potential life during the entirety of the pregnancy, "[b]efore viability, the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure." *Casey*, 505 U.S. at 846. The Supreme Court has already balanced the parties' interests and concluded that the State's pre-viability interests are simply not strong enough for it to lawfully prohibit pre-viability abortions. Yet HEA 1337 does just that.

Accordingly, the Court concludes that the anti-discrimination provisions of HEA 1337 are unconstitutional.

**B.**     <u>**Information Dissemination Provision**</u>

HEA 1337 also requires abortion providers to inform their patients "[t]hat Indiana does not allow a fetus to be aborted solely because of the fetus's race, color, national origin, ancestry, sex, or diagnosis or potential diagnosis of the fetus having Down syndrome or any other disability."

Ind. Code § 16-34-2-1.1(a)(1)(K). Simply put, this provision requires abortion providers to inform patients of the anti-discrimination provisions discussed above.

PPINK maintains that requiring abortion providers to disseminate and patients to listen to this information violates their First Amendment rights regarding compelled speech and compelled listening, respectively. As the parties point out, the Seventh Circuit has not yet determined what level of scrutiny applies to the type of professional speech at issue here. (Filing No. 74 at 19-20; Filing No. 76 at 29-30.) The Court need not determine, however, what level of scrutiny applies, because the parties agree that in the event that the Court holds the anti-discrimination provisions to be unconstitutional, the information dissemination provision is likewise unconstitutional. (Filing No. 74 at 20; Filing No. 76 at 30.)

Having concluded that the anti-discrimination provisions violate the Fourteenth Amendment, the Court likewise concludes that Ind. Code § 16-34-2-1.1(a)(1)(K) is unconstitutional.

## C.    Fetal Tissue Disposition Provisions

PPINK's final challenge is to the new fetal tissue disposition provisions created by HEA 1337. PPINK contends that these requirements violate substantive due process and equal protection principles.[3]

The parties agree that the fetal tissue disposition provisions do not implicate a fundamental right. When a fundamental right is not at stake, substantive due process still creates "a residual substantive limit on government action which prohibits arbitrary deprivations of liberty." *Hayden ex rel. A.H. v. Greensburg Community Sch. Corp.*, 743 F.3d 569, 576 (7th Cir. 2014). A law will survive such a challenge if the State can "demonstrate that the intrusion upon ... liberty is rationally

---

[3] Because the Court concludes that the requirements violate substantive due process principles, it need to reach the equal protection issue.

related to a legitimate government interest." *Id.*; *Charleston v. Bd. of Trustees of Univ. of Ill. at Chi.*, 741 F.3d 769, 774 (7th Cir. 2013) ("Substantive due process requires only that the practice be rationally related to a legitimate government interest, or alternatively phrased, that the practice be neither arbitrary nor irrational."). It is ultimately the plaintiff's burden to demonstrate that the challenged law "lacks a rational relationship with a legitimate government interest; it is not the [government's] obligation to prove rationality with evidence." *Hayden*, 743 F.3d at 576. The plaintiff's burden is a "heavy one: So long as there is any conceivable state of facts that supports the policy, it passes muster under the due process clause; put another way, only if the policy is patently arbitrary would it fail." *Id.*

The State describes its interest as "treating fetal remains the same as other human remains," (Filing No. 76 at 30), or alternatively, "the humane disposal of fetal remains," (Filing No. 76 at 35). PPINK argues that this asserted interest is insufficient because the State has no legitimate interest in ensuring that abortion providers treat fetal tissue in the same manner as human remains. Specifically, PPINK maintains that the State's asserted interest would require this Court "to make a leap that the Supreme Court has refused to take. Namely, to decide that human life begins at conception and that a fetus is a human being." (Filing No. 74 at 21.)

The Court concludes that the State's asserted interest is not legitimate. As the Seventh Circuit has noted, the Supreme Court and the circuit courts applying Supreme Court precedent have unequivocally held that for purposes of the Fourteenth Amendment, a fetus is not a "person." *See Coe* 162 F.3d at 495 (citing *Roe*, 410 U.S. at 158; *Casey*, 505 U.S. at 912 [Stevens, J., concurring]; *Reed v. Gardner*, 986 F.2d 1122, 1128 (7th Cir. 1993); *Alexander v. Whitman*, 114 F.3d 1392, 1400 (3d Cir. 1997); *Crumpton v. Gates*, 947 F.2d 1418, 1421 (9th Cir. 1991)). As such, the Court can find no legal basis for the State to require health care providers to treat fetal

remains in the same manner as human remains. Stated otherwise, if the law does not recognize a fetus as a person, there can be no legitimate state interest in requiring an entity to treat an aborted fetus *the same* as a deceased human.

The State points to other state and federal statutes as being "full of provisions that equate even a non-viable fetus with a human being," arguing that these statutes are analogous, and that the State's asserted interest is therefore legitimate. ([Filing No. 76 at 30-33](#).) What those statutes do not share in common with the present law, however, is that they concern circumstances in which the State seeks to promote respect for potential life. No potential life is at issue in this provision. Absent a potential life, this Court would have to determine that fetal tissue is in some respects the equivalent of human remains for the State's interest to be legitimate. This would be quite similar to a recognition that a fetus is a person, an affirmation which this Court is not allowed to make. As explained by the Seventh Circuit, the conclusion in *Roe* that a fetus is not a person "follows inevitably from the decision to grant women a right to abort. If even a first-trimester fetus is a person, surely the state would be allowed to protect him from being killed ...." *Coe*, 162 F.3d at 495.

The State also argues that "respectful treatment of fetal remains also stems from cultural and religious traditions," and it cites to Hindu, Buddhist, and Christian practices that "treat deceased fetuses as persons." ([Filing No. 76 at 34](#).) Aside from the obvious entanglement of church and state suggested by this argument, it also ignores the fact that the law as it existed prior to the passage of HEA 1337 allowed individuals ample leeway to vindicate their own relevant religious or cultural practices. A patient was permitted to take possession of the fetal tissue, whether the result of an abortion or a miscarriage, and dispose of it in whatever manner she chose, including in accordance with her particular religious or cultural beliefs.

Second, the State boldly contends that it is a "biological fact" that embryonic fetal tissue is a "human being." (Filing No. 76 at 30.) The Supreme Court, however, has not reached the same conclusion. Whether or not an individual views fetal tissue as essentially the same as human remains is each person's own personal and *moral* decision. *Cf. Roe*, 410 U.S. at 159 ("[w]hen those trained in the respective disciplines of medicine, philosophy, and theology are unable to arrive at any consensus, the judiciary, at this point in the development of man's knowledge, is not in a position to speculate as to the answer."); *Casey,* 505 U.S. at 851 ("At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State."). The Court cannot resolve this moral question. But as a *legal* question, there is currently no basis which would allow this Court to recognize fetal tissue as a human being, and therefore analogous to human remains.

Notably, courts that have upheld requirements regarding the disposition of fetal tissue have done so by recognizing a legitimate state interest in ensuring the sanitary disposal of fetal tissue.[4] *See, e.g.*, *Leigh v. Olson*, 497 F.Supp. 1340, 1351 (D.N.D. 1980) (recognizing that there is a legitimate state interest in regulating "the disposal of dead fetuses to protect the public health"). But the State does not attempt to justify the fetal tissue disposition provisions on this basis, likely because Indiana statutes already require that fetal tissue be disposed of in a sanitary manner.

In sum, the Court can find no legal support for the State's position that it has a legitimate interest in "treating fetal remains the same as other human remains." (Filing No. 76 at 35.) The

---

[4] A fetal tissue disposition statute was upheld in *Planned Parenthood of Minn. v. State of Minn.*, 910 F.2d 479 (8th Cir. 1990), but in that case the plaintiff "concede[d] the state has a legitimate interest in protecting public sensibilities." *Id.* at 488. Not only was no similar concession made here, but the State's asserted legitimate interest is meaningfully different in this case. For both of these reasons, the Eighth Circuit's decision is of no persuasive value here.

Supreme Court has made clear that a fetus is not legally a person, but the State's asserted interests are essentially that fetal tissue should be treated similarly to human remains because they are like human remains. Although the Supreme Court has recognized a legitimate governmental interest in promoting the life of a fetus during a pregnancy, such an interest is always tethered to the notion that the fetus represents a potential life and the State can legitimately promote respect for that potentiality. The Supreme Court has extended these principles no further than that, and the State has not provided a basis so that this Court can do otherwise. Therefore, any legitimate interest the State has in a potential life during a pregnancy is no longer present once the pre-viability pregnancy is terminated; and thus, it does not have a legitimate state interest in treating fetal tissue similarly to human remains.

Even if the Court were to conclude that the State had a legitimate interest in treating embryonic and fetal tissue "the same as other human remains," the disposition provision is not rationally related to that purpose, because in most respects, it does not treat fetal tissue in the same manner that it treats human remains. First, it allows patients to take possession of the fetal tissue and imposes no restrictions whatsoever on the manner in which they choose to dispose of that tissue. The same is not true of the disposition of human remains, which are subject to numerous requirements regarding burial and cremation. For example, state law enumerates the permitted dispositions of human bodies, including, *inter alia*, interment in an established cemetery, disposal of cremated human remains on the property of a consenting owner or an uninhabited public land, or burial at sea. Ind. Code § 25-15-2-7. State law also provides, with great specificity, details regarding burial, such as the minimum depth at which human remains must be buried, and proper ventilation if remains are placed in a mausoleum. *See, e.g.,* Ind. Code §§ 34-14-54-2, 23-14-54-3. Second, the provision allows for the simultaneous cremation of fetal tissue from an unspecified

number of patients.  Simultaneous cremation is only permitted for human remains if consented to in writing by the authorizing agent(s).  Ind. Code § 23-14-31-39(a).[5]  The Court sees no rational relationship between the State's purported goal—treating fetal tissue like human remains—and the law as written, given that it permits both the release of fetal tissue to patients with no restrictions whatsoever, and the mass cremation of fetal tissue.

For the reasons above, the Court concludes that the challenged disposition provisions violate the Fourteenth Amendment to the U.S. Constitution.

## IV.  CONCLUSION

The United States Supreme Court has stated in categorical terms that a state may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability. It is clear and undisputed that unless *Roe v. Wade* and *Planned Parenthood of Se. Pa. v. Casey* are overturned by the United States Supreme Court, this Court is bound to follow that precedent under the rule of *stare decisis*.  *See Casey,* 505 U.S. at 870 (stating that the doctrine of *stare decisis* requires reaffirmation of *Roe's* essential holding recognizing a woman's right to choose an abortion before fetal viability); *MKB Mgmt. Corp. v. Burdick*, 954 F.Supp.2d 900 (D.N.D. 2013) ("[n]o judge in the United States can overrule *Roe v. Wade*; only the Supreme Court can do so"); *Sojourner v. Roemer*, 772 F.Supp. 930, 932 (E.D. La. 1991).

The challenged anti-discrimination provisions directly contravene well-established law that precludes a state from prohibiting a woman from electing to terminate a pregnancy prior to fetal viability.  The information dissemination provision is also unconstitutional, as it requires abortion providers to convey false information regarding the anti-discrimination provisions to their

---

[5] As PPINK highlights, it was already disposing of fetal tissue by utilizing professional, regulated removal companies to collect and incinerate it.  ([Filing No. 74 at 22.](#))  The two major changes instituted by HEA 1337 are that it requires PPINK to use crematories, rather than facilities that handle medical tissue, and that PPINK is required to take possession of the ashes after cremation (at which time, presumably, it may dispose of those in any manner permitted by statute).  ([Filing No. 74 at 22.](#))

patients. The fetal tissue disposition provisions do not further a legitimate state interest and are therefore also unconstitutional.

Accordingly, PPINK's Motion for Summary Judgment, (Filing No. 73), is **GRANTED**, and the State's Motion for Summary Judgment, (Filing No. 75), is **DENIED**.

The Court **ISSUES A PERMANENT INJUNCTION** prohibiting the State from enforcing the following provisions of HEA 1337: the anti-discrimination provisions, Indiana Code §§ 16-34-4-4, 16-34-4-5, 16-34-4-6, 16-34-4-7, 16-34-4-8, the information dissemination provision, Indiana Code § 16-34-2-1.1(a)(1)(K), and the fetal tissue disposition provisions.

**SO ORDERED.**

Date: 9/22/2017

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Kenneth Biggins, Jr.
INDIANA ATTORNEY GENERAL
kenneth.biggins@atg.in.gov

Anthony Scott Chinn
FAEGRE BAKER DANIELS LLP
scott.chinn@faegrebd.com

Jennifer Dalven
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
jdalven@aclu.org

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

Thomas M. Fisher
ATTORNEY GENERAL'S OFFICE
tom.fisher@atg.in.gov

Helene T. Krasnoff
PLANNED PARENTHOOD
FEDERATION OF AMERICA
helene.krasnoff@ppfa.org

Lara K. Langeneckert
INDIANA ATTORNEY GENERAL
lara.langeneckert@atg.in.gov

Jan P. Mensz
ACLU OF INDIANA
jmensz@aclu-in.org

Anne Kramer Ricchiuto
FAEGRE BAKER DANIELS LLP
anne.ricchiuto@FaegreBD.com

Gavin Minor Rose
ACLU OF INDIANA
grose@aclu-in.org

Juliana Yanez
FAEGRE BAKER DANIELS
juliana.yanez@faegrebd.com