# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## NOTICE OF ISSUANCE OF MANDATE

July 3, 2018

To:    Laura A. Briggs
       UNITED STATES DISTRICT COURT
       Southern District of Indiana
       United States Courthouse
       Indianapolis , IN 46204-0000

| No. 17-3163 | PLANNED PARENTHOOD OF INDIANA AND KENTUCKY, INC., et al., Plaintiffs - Appellees<br><br>v.<br><br>COMMISSIONER OF THE INDIANA STATE DEPARTMENT OF HEALTH, et al., Defendants - Appellants |
|---|---|
| **Originating Case Information:** | |
| District Court No: 1:16-cv-00763-TWP-DML<br>Southern District of Indiana, Indianapolis Division<br>District Judge Tanya Walton Pratt | |

Herewith is the mandate of this court in this appeal, along with the Bill of Costs, if any. A certified copy of the opinion/order of the court and judgment, if any, and any direction as to costs shall constitute the mandate.

RECORD ON APPEAL STATUS:          No record to be returned

**NOTE TO COUNSEL:**

If any physical and large documentary exhibits have been filed in the above-entitled cause, they are to be withdrawn ten (10) days from the date of this notice. Exhibits not withdrawn during this period will be disposed of.

Please acknowledge receipt of these documents on the enclosed copy of this notice.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Received above mandate and record, if any, from the Clerk, U.S. Court of Appeals for the Seventh Circuit.

**Date:**                                             **Received by:**

_____7/3/2018_____                    _____
                                                           Deputy Clerk, U.S. District Court

form name: **c7_Mandate**(form ID: **135**)

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



| | |
|---|---|
| Everett McKinley Dirksen United States Courthouse<br>Room 2722 - 219 S. Dearborn Street<br>Chicago, Illinois 60604 | Office of the Clerk<br>Phone: (312) 435-5850<br>www.ca7.uscourts.gov |

## FINAL JUDGMENT

June 25, 2018

Before:           WILLIAM J. BAUER, Circuit Judge

                         JOEL M. FLAUM, Circuit Judge

                         DANIEL A. MANION, Circuit Judge

| | |
|---|---|
| No. 17-3163 | PLANNED PARENTHOOD OF INDIANA AND KENTUCKY, INC., et al.,<br>  Plaintiffs - Appellees<br><br>v.<br><br>COMMISSIONER OF THE INDIANA STATE DEPARTMENT OF HEALTH, et al.,<br>  Defendants - Appellants |
| **Originating Case Information:** | |
| District Court No: 1:16-cv-00763-TWP-DML<br>Southern District of Indiana, Indianapolis Division<br>District Judge Tanya Walton Pratt | |

The judgment of the District Court is **AFFIRMED**, with costs, in accordance with the decision of this court entered on April 19, 2018, as reinstated on June 25, 2018.

form name: **c7_FinalJudgment**(form ID: **132**)

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## FINAL JUDGMENT

April 19, 2018

Before:
WILLIAM J. BAUER, Circuit Judge

JOEL M. FLAUM, Circuit Judge

DANIEL A. MANION, Circuit Judge

| No. 17-3163 | PLANNED PARENTHOOD OF INDIANA AND KENTUCKY, INC., et al., Plaintiffs - Appellees<br><br>v.<br><br>COMMISSIONER OF THE INDIANA STATE DEPARTMENT OF HEALTH, et al., Defendants - Appellants |
|---|---|
| **Originating Case Information:** | |
| District Court No: 1:16-cv-00763-TWP-DML<br>Southern District of Indiana, Indianapolis Division<br>District Judge Tanya Walton Pratt | |

The judgment of the District Court is AFFIRMED, with costs, in accordance with the decision of this court entered on this date.

In the

# United States Court of Appeals

### For the Seventh Circuit

No. 17-3163

PLANNED PARENTHOOD OF INDIANA
AND KENTUCKY, INC., *et al.*,

*Plaintiffs-Appellees,*

*v.*

COMMISSIONER OF THE INDIANA STATE
DEPARTMENT OF HEALTH, *et al.*,

*Defendants-Appellants.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:16-cv-00763-TWP-DML — **Tanya Walton Pratt**, *Judge.*

ARGUED FEBRUARY 15, 2018 — DECIDED APRIL 19, 2018

Before BAUER, FLAUM, and MANION, *Circuit Judges.*

BAUER, *Circuit Judge.* On March 24, 2016, the Governor of
Indiana signed into law House Enrolled Act No. 1337 (HEA
1337), which created new provisions and amended others
that regulate abortion procedures within Indiana. Shortly

thereafter, Planned Parenthood of Indiana and Kentucky ("PPINK") filed a lawsuit against the Commissioner of the Indiana State Department of Health, the prosecutors of Marion, Lake, Monroe and Tippecanoe Counties, and members of the Medical Licensing Board of Indiana (collectively, "the State"). PPINK sought declaratory and injunctive relief from three particular parts of the law: (1) the new provisions titled "Sex Selective and Disability Abortion Ban," Ind. Code § 16-34-4 (2016), which prohibit a person from performing an abortion if the person knows the woman is seeking an abortion solely for one of the enumerated reasons (collectively, "the non-discrimination provisions"); (2) an added provision to the informed consent process, instructing those performing abortions to inform women of the non-discrimination provisions, § 16-34-2-1.1(a)(1)(K); and (3) numerous amendments to the provisions dealing with the disposal of aborted fetuses, §§ 16-34-3-4(a); 16-41-16-4(d); 16-41-16-5; 16-41-16-7.6 (collectively, "the fetal disposition provisions").

The district court initially entered a preliminary injunction on June 30, 2016, and both parties subsequently filed motions for summary judgment. The court granted PPINK's motion for summary judgment on September 22, 2017, declaring the three parts of HEA 1337 unconstitutional and permanently enjoining the State from enforcing them.

We affirm. The non-discrimination provisions clearly violate well-established Supreme Court precedent holding that a woman may terminate her pregnancy prior to viability, and that the State may not prohibit a woman from exercising that right for any reason. Because the non-discrimination provisions are unconstitutional, so too is the provision that a woman be informed of them. Additionally, the amended fetal disposi-

tion provisions violate substantive due process because they
have no rational relationship to a legitimate state interest.

## I. BACKGROUND

PPINK provides reproductive health services and educa-
tion to thousands of women throughout Indiana and Ken-
tucky. At its Bloomington, Indianapolis and Merrillville
centers, PPINK performs surgical abortions through the first
trimester of pregnancy (approximately 14 weeks). At these
three centers, as well as the Lafayette center, PPINK also
performs non-surgical, or medication, abortions.

### A. The Non-Discrimination and Informed Consent
Provisions

HEA 1337 creates Indiana Code chapter 16-34-4, entitled
"Sex Selective and Disability Abortion Ban." The various
provisions of this chapter prohibit abortions at any time,
including prior to viability, if the abortion is sought for a
particular purpose. Specifically, the non-discrimination
provisions state that "[a] person may not intentionally perform
or attempt to perform an abortion before the earlier of viability
of the fetus or twenty (20) weeks of postfertilization age if the
person knows that the pregnant woman is seeking" an abor-
tion: (1) "solely because of the sex of the fetus," Ind. Code
§§ 16-34-4-4, 16-34-4-5; (2) "solely because the fetus has been
diagnosed with Down syndrome or has a potential diagnosis
of Down syndrome," or has been diagnosed or has a potential
diagnosis of "any other disability," §§ 16-34-4-6, 16-34-4-7; or
(3) "solely because of the race, color, national origin, or
ancestry of the fetus." § 16-34-4-8. The term "potential diagno-
sis" means "the presence of some risk factors that indicate that
a health problem may occur," § 16-34-4-3, and "any other
disability" is defined as "any disease, defect, or disorder that

is genetically inherited," including both physical and mental disabilities. § 16-34-4-1.

Under Indiana law, it is a felony to knowingly and intentionally perform an abortion that is prohibited by law. *See* § 16-34-2-7(a). Moreover, a person who knowingly and intentionally provides an unlawful abortion is subject to (1) "disciplinary sanctions," and (2) "civil liability for wrongful death." § 16-34-4-9(a).

Indiana law requires that certain information be provided to a woman at least 18 hours prior to the abortion as part of the voluntary and informed consent process. *See* § 16-34-2-1.1(a). HEA 1337 adds a new provision requiring the abortion provider to inform a woman "[t]hat Indiana does not allow a fetus to be aborted solely because of the fetus's race, color, national origin, ancestry, sex, or diagnosis or potential diagnosis of the fetus having Down syndrome or any other disability." § 16-34-2-1.1(a)(1)(K).

According to the State, the non-discrimination provisions were prompted by the medical advances of non-invasive genetic testing which allow for the detection of disabilities at an early stage in the pregnancy. In particular, cell-free DNA testing, which screens for several genetic disabilities such as Down syndrome, can occur as early as 10 weeks into the pregnancy. PPINK does not provide genetic testing, but is aware that it performs abortions for women solely because of the diagnosis or potential diagnosis of Down syndrome and other disabilities. PPINK and the State agree that the rate of women seeking an abortion due to the diagnosis or potential diagnosis of a genetic disability will likely increase as these tests become more widespread.

### B.  The Fetal Disposition Provisions

HEA 1337 also changes the manner in which abortion providers must dispose of aborted fetuses. HEA 1337 did not alter the provision of the Indiana Code that gives a woman "the right to determine the final disposition of the aborted fetus." § 16-34-3-2(a). Prior to the enactment of HEA 1337, if a woman decided to let the abortion facility dispose of the fetus, Indiana regulations state that the facility must either bury or cremate the fetus. *See* 410 Ind. Admin. Code § 35-2-1(a). Those regulations specify that cremation means "incineration by a crematory, or incineration as authorized for infectious and pathological waste" under Indiana law. 410 Ind. Admin. Code § 35-1-3. Infectious waste includes pathological waste, Ind. Code § 16-41-16-4(b)(1), and pathological waste is defined as "(1) tissue; (2) organs; (3) body parts; and (4) blood or body fluids in liquid or semiliquid form; that are removed during surgery, biopsy, or autopsy." § 16-41-16-5.

Thus, prior to the enactment of HEA 1337, a woman might decide to dispose of the aborted fetus herself; or the facility that provided the abortion might dispose of the fetus through incineration along with other surgical byproducts. PPINK has utilized a contractor who periodically incinerates aborted fetuses along with other surgical byproducts.

HEA 1337 alters the manner in which an abortion provider must dispose of an aborted fetus if the woman elects not to dispose of it herself. Specifically, the new law states that "[a]n abortion clinic or health care facility having possession of an aborted fetus shall provide for the final disposition of the aborted fetus. The burial transmit permit requirements of [Indiana Code] 16-37-3 apply to the final disposition of an aborted fetus, which must be interred or cremated." § 16-34-3-

4(a). A "burial transmit permit" is a "permit for the transportation and disposition of a dead human body" as required under Indiana law. § 23-14-31-5. The amended provisions also state that "[a]borted fetuses may be cremated by simultaneous cremation." § 16-34-3-4(a).

Moreover, HEA 1337 changed the definitions of both infectious and pathological waste, stating that these terms "do[] not include an aborted fetus or a miscarried fetus." §§ 16-41-16-4(d), 16-41-16-5. Thus, abortion providers like PPINK will no longer be able to contract with third parties to incinerate aborted fetuses with other surgical byproducts. Rather, the law will require PPINK to bury, cremate, or entomb the aborted fetuses, although the fetuses may be cremated simultaneously.

## C.  Procedural History

On April 7, 2016, two weeks after the Indiana Governor signed HEA 1337, PPINK filed a complaint in the Southern District of Indiana seeking declaratory and injunctive relief from the non-discrimination and fetal disposition provisions, which it alleged were unconstitutional. HEA 1337 was to go into effect on July 1, 2016. After extensive briefing and oral argument, the district court determined on June 30, 2016, that PPINK was likely to succeed on the merits, and granted a preliminary injunction barring the State from implementing and enforcing these provisions.

Both PPINK and the State moved for summary judgment. On September 22, 2017, the district court granted PPINK's motion for summary judgment and entered a permanent injunction declaring the non-discrimination and fetal disposition provisions unconstitutional. *Planned Parenthood of Ind. & Kent., Inc. v. Comm'r, Ind. State Dep't of Health*, 265 F. Supp. 3d

859 (S.D. Ind. 2017). The court found that the non-discrimination provisions clearly violate Supreme Court precedent that a woman has the right to terminate her pregnancy prior to viability without undue interference from the State. *Id.* at 865–69. Having found those provisions unconstitutional, the court also held that the informed consent provision on the non-discrimination provisions was unconstitutional. *Id.* at 869. Finally, the court held that although the fetal disposition provisions do not implicate a fundamental right, they violate substantive due process because they lack a rational relationship to a legitimate governmental interest. *Id.* at 869–72.

## II. DISCUSSION

We review a grant of summary judgment *de novo*, construing all factual disputes and reasonable inferences in favor of the non-moving party. *Golla v. Office of Chief Judge of Cook Cty., Ill.*, 875 F.3d 404, 407 (7th Cir. 2017). The moving party is entitled to summary judgment as a matter of law if they have shown there is "no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).

### A. The Non-Discrimination Provisions Violate a Woman's Fourteenth Amendment Right to Terminate Her Pregnancy Prior to Viability

Forty-five years ago, the Supreme Court recognized that the right to privacy, as rooted in the Due Process Clause of the Fourteenth Amendment's concept of liberty, "is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." *Roe v. Wade*, 410 U.S. 113, 153 (1973). The Court in *Roe* recognized that "this right is not unqualified," and that it must be balanced "against important state interests in regulation." *Id.* at 154. *Roe* developed a rigid trimester

framework by which to balance the competing interests. *Id.* at 164–65.

Although the Supreme Court abandoned the trimester framework when it revisited *Roe*'s holding nearly twenty years later in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, it reaffirmed what it labeled as *Roe*'s "essential holding:"

> First is a recognition of the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State. Before viability, the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure. Second is a confirmation of the State's power to restrict abortions after fetal viability, if the law contains exceptions for pregnancies which endanger the woman's life or health. And third is the principle that the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child. These principles do not contradict one another; and we adhere to each.

505 U.S. 833, 846 (1992) (plurality opinion).

The Court in *Casey* drew the line between a woman's privacy right and the State's interest in protecting the potential life of a fetus at viability. *Id.* at 870. Importantly, *Casey*'s holding that a woman has the right to terminate her pregnancy prior to viability is categorical: "a State *may not prohibit* any woman from making the ultimate decision to terminate her pregnancy *before viability*." *Id.* at 879 (emphasis added). Since

No. 17-3163                                              9

*Casey*, this unambiguous holding has continued to be recognized as controlling precedent by the Supreme Court and this Court. *See Gonzales v. Carhart*, 550 U.S. 124, 146 (2007); *Stenberg v. Carhart*, 530 U.S. 914, 921 (2000); *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't Health*, 699 F.3d 962, 987 (7th Cir. 2012).

*Casey*, like *Roe*, also noted that this right was not absolute. *Casey*, 505 U.S. at 875–76. "The very notion that the State has a substantial interest in potential life leads to the conclusion that not all regulations must be deemed unwarranted." *Id.* at 876. Accordingly, *Casey* introduced the undue burden standard: a state regulation creates an undue burden on a women's right to terminate her pregnancy if it "has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.* at 877. The Court in *Casey* elaborated that these sort of regulations prior to viability "must be calculated to *inform* the women's free choice, *not hinder it*." *Id.* (emphasis added). Thus, while the State may enact measures to inform a woman's choice to terminate her pregnancy, the State may not prohibit the woman from making "the ultimate decision." *Id.* at 878–79.

The non-discrimination provisions clearly violate this well-established Supreme Court precedent, and are therefore, unconstitutional. The provisions prohibit abortions prior to viability if the abortion is sought for a particular purpose. These provisions are far greater than a substantial obstacle; they are absolute prohibitions on abortions prior to viability which the Supreme Court has clearly held cannot be imposed by the State. *Id.* at 879 ("a State *may not prohibit* any woman from making the ultimate decision to terminate her pregnancy before viability.") (emphasis added). We are bound to follow that Supreme Court precedent. *See Karlin v. Foust*, 188 F.3d 446,

495 (7th Cir. 1999). Unsurprisingly, other circuits who have dealt with prohibitions prior to viability have had no trouble striking them down. *See, e.g.*, *MKB Mgmt. Corp. v. Stenehjem*, 795 F.3d 768, 773 (8th Cir. 2015) (statute prohibiting pre-viable abortions where the fetus has a detectable heartbeat); *McCormack v. Herzog*, 788 F.3d 1017, 1029 (9th Cir. 2015) (statute prohibiting pre-viable abortions where fetus is at least 20 weeks gestational age); *Edwards v. Beck*, 786 F.3d 1113, 1117 (8th Cir. 2015) (statute prohibiting pre-viable abortions after twelve weeks where the fetus has a detectable heartbeat).

The State knows we cannot overturn Supreme Court precedent; rather, it argues that the non-discrimination provisions are reconcilable with this precedent. The State creatively suggests that *Casey* only reaffirmed a woman's "binary choice" of whether or not to have a child prior to viability. *See Casey*, 505 U.S. at 851 ("Our cases recognize 'the right of the *individual*, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child.'") (quoting *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972)). In other words, according to the State, *Casey* only recognized a privacy right in the binary decision of whether to bear or beget a child, but that right is not extended to the decision to terminate a particular child.

Neither *Casey*, nor any other case, supports this "binary choice" theory. Under this theory, a woman may terminate her pregnancy if she decides *before* becoming pregnant that she does not want to bear a child at all, but she has no right to terminate the pregnancy if she determines *after* becoming pregnant that she does not want a particular child. Nothing in *Roe*, *Casey*, or any other case from the Supreme Court can be read to limit a woman's right in this way. Moreover, no court,

No. 17-3163                                                      11

let alone the Supreme Court, has recognized such a limitation. Rather, *Casey* held that the State may not prohibit a woman from making the "ultimate decision" to terminate her pregnancy prior to viability, and the State's power, prior to viability, is limited to informing the woman's choice. *Id.* at 877–79.

Moreover, such a "binary choice" theory runs contrary to the fact that a woman's right to terminate her pregnancy prior to viability is rooted in the Fourteenth Amendment's right to privacy. It is entirely inconsistent to hold that a woman's right of privacy to terminate a pregnancy exists if a woman decides before she becomes pregnant that she does not want to bear a child, but that the State can eliminate this privacy right if a woman later decides she wants to terminate her pregnancy for a particular purpose. Nothing in the Fourteenth Amendment or Supreme Court precedent allows the State to invade this privacy realm to examine the underlying basis for a woman's decision to terminate her pregnancy prior to viability.

The State urges that the non-discrimination provisions represent a "qualitatively new type of abortion regulation," and that it has compelling interests in prohibiting discrimination of particular fetuses in light of technological advances in genetic screening. Indeed, as we have noted, the State "has legitimate interests from the outset of the pregnancy in protecting the health of the woman and life of the fetus that may become a child." *Id.* at 846. But the Supreme Court has already weighed the State's interests against a woman's privacy right to terminate her pregnancy prior to viability: "*Before viability, the State's interests are not strong enough to support a prohibition of abortion* or the imposition of a substantial obstacle to the woman's effective right to elect the procedure."

No. 17-3163

*Id.* (emphasis added).[1] We cannot reweigh a woman's privacy right against the State's interest. The Supreme Court has been clear: the State may inform a woman's decision before viability, but it cannot prohibit it.

The State concedes that if we conclude the non-discrimination provisions are unconstitutional, the provision requiring abortion providers to inform women of the non-discrimination provisions is also unconstitutional. Since we conclude that the non-discrimination provisions found in the "Sex Selective and Disability Abortion Ban," Ind. Code § 16-34-4, violate a woman's Fourteenth Amendment right to privacy, § 16-34-2-1.1(a)(1)(K) of the informed consent provisions is unconstitutional, as well.

## B. The Fetal Disposition Provisions Violate Substantive Due Process

PPINK contends that the fetal disposition provisions violate both substantive due process and equal protection principles. Since we conclude that the fetal disposition provisions violate due process, we need not address whether the provisions suffer from any equal protection problems.

-------------------

[1] Wisconsin and other states, as amici curiae, maintain that *Casey* only addressed the state interests "*actually urged*" before the Supreme Court, such as the State's general interest in unborn life and the health of the mother." They thus contend that "[i]t is wrong to understand the Supreme Court's language as holding that pre-viability abortion is such an absolute right that every conceivable state interest must always yield to that right." This argument is not persuasive because it ignores that Court's rationale for providing the right to an abortion prior to viability in the first place; the woman's right to privacy protected by the liberty interest guaranteed by the Fourteenth Amendment. In short, the Court's decision to draw the line at viability was more about the woman's liberty interest than the State's competing interest.

PPINK agrees that no fundamental right is at stake. When a fundamental right is not implicated, substantive due process only "prohibits arbitrary deprivations of liberty by the government." *Hayden ex rel. A.H. v. Greensburg Cmty. Sch. Corp.*, 743 F.3d 569, 576 (7th Cir. 2014). Accordingly, we apply rational-basis review, meaning the fetal disposition provisions must "be rationally related to legitimate government interests." *Washington v. Glucksberg*, 521 U.S. 702, 728 (1997). It is incumbent upon PPINK to demonstrate that the provisions violate substantive due process, and PPINK carries a high burden: "So long as there is any conceivable state of facts that supports the policy, it passes muster under the due process clause; put another way, only if the policy is patently arbitrary would it fail." *Hayden*, 743 F.3d at 576.

The fetal disposition provisions essentially require abortion providers to dispose of aborted fetuses in the same manner as human remains, as required under Indiana law. According to the State, the provisions further the State's legitimate interest in "the humane and dignified disposal of human remains." Such a position inherently requires a recognition that aborted fetuses are human beings, distinct from other surgical byproducts, such as tissue or organs. Indeed, in its brief, Indiana maintained that it "validly exercised its police power by making a moral and scientific judgment *that a fetus is a human being* who should be given a dignified and respectful burial and cremation." (emphasis added).

However, the Supreme Court has concluded that "the word 'person,' as used in the Fourteenth Amendment, does not include the unborn." *Roe*, 410 U.S. at 158. In reaching this conclusion, the Court in *Roe* noted that "[w]hen those trained in the respective disciplines of medicine, philosophy, and theology are unable to arrive at any consensus, the judiciary,

at this point in the development of man's knowledge, is not in a position to speculate as to the answer." *Id.* at 159. While this question may continue to be disputed among those respective disciplines, it is not disputed in the law. *See Coe v. Cty. of Cook*, 162 F.3d 491, 495 (7th Cir. 1998) ("[T]he courts have decided that a fetus is not a person within the meaning of these clauses.").

Simply put, the law does not recognize that an aborted fetus is a person. "This conclusion follows inevitably from the decision to grant women a right to abort. If even a [non-viable] fetus is a person, surely the state would be allowed to protect [the fetus] from being killed." *Id.* As such, the State's interest in requiring abortion providers to dispose of aborted fetuses in the same manner as human remains is not legitimate.

The State asks us to infer a legitimate interest by pointing to state and federal fetal homicide statutes, as well as state wrongful death statutes that treat non-viable fetuses as human beings. But these statutes seek to address a valid state interest in promoting respect for potential life. The fetal disposition provisions differ because there is no potential life at stake. The State also argues that the Supreme Court in *Gonzales v. Carhart* recognized the State's interest in fetal human dignity. 550 U.S. at 163 (noting "the State's interest in promoting respect for human life at all stages of the pregnancy"). However, *Gonzales* involved a "ban on abortions that involve partial delivery of a *living* fetus." *Id.* at 158 (emphasis added). *Gonzales* did not extend the State's interest beyond protecting potential fetal life that was reaffirmed in *Casey*. *Id.* ("[T]he State, from the inception of pregnancy, maintains its own regulatory interest in protecting the life of the fetus that may become a child.").

The State also relies on an Eighth Circuit decision upholding, on vagueness and substantive due process challenges, a Minnesota fetal disposition statute, which provided that fetuses of a certain age be disposed of "by cremation, interment by burial, or in a manner directed by the commissioner of health." *Planned Parenthood of Minn. v. State of Minn.*, 910 F.2d 479, 481 n.2 (8th Cir. 1990). As that court noted, the Supreme Court has recognized that the State has a legitimate interest "in regulating the disposal of fetal remains." *Id.* at 481; *see also City of Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416, 452 n.45 (1983), *overruled on other grounds by Casey*, 505 U.S. at 881–85 (noting that a state or municipality has a "legitimate interest in proper disposal of fetal remains").

First, in *Planned Parenthood of Minnesota*, "Planned Parenthood concede[d] the state ha[d] a legitimate interest in protecting public sensibilities." 910 F.2d at 488. Therefore, the Eighth Circuit's discussion about the nature of the state interest was mere dicta. Second, the State's interest here in the humane and dignified disposal of an aborted fetus is meaningfully different. The Minnesota statute's stated purpose was "to protect the public health and welfare by providing for the dignified and sanitary disposition of the remains of aborted or miscarried fetuses in a uniform manner." *Id.* at 481 n.2. The Eighth Circuit reiterated that the "Minnesota's legislature's overriding concern was protection of the public's sensibilities by ensuring that fetal remains be disposed of in a specified manner." *Id.* at 488. Thus, while Minnesota focused on the interest of the *public*, Indiana focuses on the interest of the *fetus*. Indeed, the State's interest here goes well beyond the sanitary or unitary disposal of aborted fetuses, interests which are already being carried out under current Indiana law and health regulations prior to HEA 1337. Instead, the humane and dignified disposal

of aborted fetuses requires recognizing that the fetus is legally equivalent to a human. Since the law does not recognize the fetus as a person, that is simply not a legitimate interest.

Even if we were to conclude that the State's interest is legitimate, it is not rationally related to that interest for two reasons. First, the fetal disposition provisions did not amend Indiana law that gives a woman "the right to determine the final disposition of the aborted fetus." Ind. Code § 16-34-3-2(a). Thus, a woman may take possession of the aborted fetus and dispose of it in whatever manner she wishes, without restriction. No such provision under Indiana law allows for people to dispose of human remains in whatever manner they wish. Rather, Indiana law is exhaustive in its requirements for the disposition of human remains. *See* § 16-37-3-1, *et. seq.* (regulating disposition of dead bodies); § 23-14-54-1, *et seq.* (setting forth the disposition of dead human bodies at crematories); § 25-15-2-7 (defining disposition of human remains as interment at cemetery or mausoleum; disposal of cremated remains on property, public land, or water; or burial at sea, among other definitions).

Second, the fetal disposition provisions also allow for simultaneous cremation of aborted fetuses. § 16-34-3-4(a). Indiana law only permits simultaneous cremation of human remains if there is prior written consent by authorizing agents. § 23-14-31-39(a). By allowing simultaneous cremation, the fetal disposition provisions do not treat aborted fetuses the same as human remains. In fact, PPINK essentially employs simultaneous cremation under the current law; HEA 1337 would simply prevent PPINK from using third parties for mass cremation with other surgical byproducts.

No. 17-3163                                                17

Thus, we cannot identify a rational relationship between the State's interest in "the humane and dignified disposal of human remains" and the law as written, given that it allows a woman full liberty to dispose of the fetus without restriction, and continues to allow for mass cremation of fetuses. Accordingly, the fetal disposition provisions violate substantive due process and are also unconstitutional.

## III. CONCLUSION

Because we conclude that the non-discrimination provisions and the fetal disposition provisions are unconstitutional, we AFFIRM the district court's grant of summary judgment in favor of PPINK, and the court's permanent injunction barring the enforcement of these provisions.

18                                          No. 17-3163

MANION, *Circuit Judge*, concurring in the judgment in part and dissenting in part. To put it mildly, this is an unfortunate case. Yet I must agree with the court that Supreme Court precedent compels us to invalidate Indiana's attempt to protect unborn children[1] from being aborted solely because of their race, sex, or disability. That a narrowly drawn statute meant to protect especially vulnerable unborn children cannot survive scrutiny under *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), is regrettable. But the fact remains that under the *Casey* regime, the purported right to have a pre-viability abortion is more ironclad even than the rights enumerated in the Bill of Rights. Only a majority of the Supreme Court or a constitutional amendment can permit the States to place some limits on abortion.

The court then goes further than *Casey* requires, distinguishing an Eighth Circuit case and invalidating Indiana's requirement that abortion clinics bury or cremate fetal remains. I cannot agree. This is but the latest example of the legal misdirection that occurs in abortion cases. See *Hill v. Colorado*, 530 U.S. 703, 741–42 (2000) (Scalia, J., dissenting). Under traditional rational basis review, if state action doesn't infringe upon a fundamental right or affect a protected class, we will uphold it so long as it is rationally related to a legitimate state

---

[1] The term "unborn child" is disfavored by some pro-choice advocates, but it is also used in Supreme Court opinions. See *Gonzales v. Carhart*, 550 U.S. 124, 134 (2007) ("Abortion methods vary depending to some extent on the preferences of the physician and, of course, on the term of the pregnancy and the resulting stage of the unborn child's development."). I use it throughout this dissent to refer to the living fetus developing during the course of a pregnancy.

interest. The fetal remains provision easily satisfies that extremely deferential standard. That part of Indiana's law rationally advances Indiana's interests in protecting public sensibilities and recognizing the dignity and humanity of the unborn.

For the reasons that follow, I concur only in the court's judgment invalidating the nondiscrimination and disclosure provisions. I dissent from the portion of the judgment invalidating the fetal remains provision.

## I. The Nondiscrimination Provisions

House Enrolled Act 1337 prohibits the performance of an abortion when the doctor knows that the woman seeks an abortion solely because of the race, sex, or disability of the unborn child. The provisions apply at any point in the pregnancy, so they directly implicate the right devised in *Casey* and *Roe v. Wade*, 410 U.S. 173 (1973). *Casey*'s controlling joint opinion held that any regulation on abortion is invalid if it "has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U.S. at 877 (plurality opinion). The nondiscrimination provisions have both the purpose *and* effect of *prohibiting* some women—those who want sex-, race-, or disability-selective abortions—from obtaining an abortion. Thus, they erect a substantial obstacle for those women. *See Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2320 (2016) ("the relevant denominator is 'those [women] for whom [the provision] is an actual rather than an irrelevant restriction.'" (quoting *Casey*, 505 U.S. at 895)).

Indiana and the *amici* States persuasively argue that the right identified in *Roe* and *Casey* is only the right to decide

20                                          No. 17-3163

*whether* to have a child, not the right to decide *which* child to
have. This argument makes sense. After all, the women for
whom the nondiscrimination provisions present an obstacle
have already determined that they want a child. The nondis-
crimination provisions simply prohibit those women from
targeting their unborn child because of later-discovered im-
mutable human characteristics. Indiana and the *amici* States
have made a noble effort to defend a statute that should need
no defense. But the fact remains that *Casey* has plainly estab-
lished an absolute right to have an abortion before viability.
The joint opinion says that *nothing* can stand between a
woman and her choice of abortion before viability. See, e.g.,
*Casey*, 505 U.S. at 870 ("We conclude the line should be drawn
at viability, so that before that time the woman has a right to
choose to terminate her pregnancy."); *id.* at 874 ("[T]he right
protects the woman from unduly burdensome interference
with her freedom to decide whether to terminate her preg-
nancy."); *id.* at 877 ("What is at stake is the woman's right to
make the ultimate decision, not a right to be insulated from
all others in doing so."). While States may legislate to encour-
age informed consent or maternal health, legislation that does
*too well* at convincing women to choose life has been held in-
valid. See *id.* at 992 (Scalia, J., concurring in the judgment in
part and dissenting in part).

    As an intermediate appellate court, we are bound to fol-
low *Casey*, and so I must agree with the court that the nondis-
crimination provisions are invalid. Yet this case reveals two
major flaws of the *Casey* analysis that combine to produce
such an absurd result—absurd even relative to other abortion
cases. First, *Casey* treats abortion as a super-right, more sacro-
sanct even than the enumerated rights in the Bill of Rights.
And second, while *Casey* jettisoned *Roe*'s strict-scrutiny test

for all first-trimester abortion regulation, it replaced strict scrutiny with an effects-based test that is actually *more difficult* to satisfy in many cases.

Further, if we applied strict scrutiny in this case, Indiana could prevail. The nondiscrimination provisions are narrowly tailored to target invidious discrimination against people whom nobody would deny would be members of protected classes were they allowed to be born. Surely, Indiana has a compelling interest in attempting to prevent this type of private eugenics. And the prohibitions would not affect the vast majority of women who choose to have an abortion without respect to the race, sex, or disability of the unborn child.

### A. Abortion is a "Super-Right" Immune Even to Strict Scrutiny

Ranking member of the Senate Judiciary Committee Dianne Feinstein has often referred to *Roe* as "super-precedent."[2] Of course, there's no such thing as "super-precedent"—any case may be overruled by five Supreme Court Justices. But while *Roe* isn't super-precedent, it did spawn a body of jurisprudence that has made abortion the only true "super-right" protected by the federal courts today. The purported right to an abortion before viability is the *only* one that may

---

[2] For further criticism of "super-precedent," see David French's commentary in *National Review* on Senator Feinstein's questioning of then-Judge Neil Gorsuch at his Supreme Court confirmation hearing. David French, *No, Senator Feinstein,* Roe v. Wade *is Not a 'Superprecedent'*, National Review, Mar. 21, 2017, https://www.nationalreview.com/2017/03/dianne-feinstein-roe-v-wade-neil-gorsuch-superprecedent-lie/.

not be infringed even for the very best reason. For an unenu-
merated right judicially created just 45 years ago, that is
astounding.

The typical tiers-of-scrutiny analysis courts conduct in
constitutional cases is a means-ends analysis. See *United States
v. Williams*, 616 F.3d 685, 691 (7th Cir. 2010) (If a claim falls
within the scope of the Second Amendment, courts "apply
some level of 'means-ends' scrutiny to establish whether the
regulation passes constitutional muster."). Strict scrutiny re-
quires both a compelling end and a tight fit between means
and ends; the government must "prove that the restriction
furthers a compelling interest and is narrowly tailored to
achieve that interest." *Reed v. Town of Gilbert*, 135 S. Ct. 2218,
2231 (2015) (quoting *Ariz. Free Enterprise Club's Freedom PAC
v. Bennett*, 564 U.S. 721, 734 (2011)). That's a hard standard to
meet, but the Supreme Court has in recent years held that re-
strictions on fundamental rights like freedom of speech and
the right to be free from racial discrimination satisfied strict
scrutiny. See, e.g., *Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656
(2015) (upholding Florida judicial conduct rule prohibiting ju-
dicial candidates from personally soliciting campaign funds);
*Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198 (2016) (uphold-
ing racially discriminatory college admissions program on the
ground that it is narrowly tailored to satisfy the university's
interest in attaining diverse student body). This isn't surpris-
ing in its own right. After all, "even the fundamental rights of
the Bill of Rights are not absolute." *Kovacs v. Cooper*, 336 U.S.
77, 85 (1949). But when contrasted against the absolute nature
of the putative right to pre-viability abortion, we see that
abortion is now a more untouchable right than even the free-
dom of speech.

No. 17-3163                                                        23

The doctrinal reason for this is that *Casey*'s "undue burden" standard is not a means-ends test, but a pure effects test. The key quote from the *Casey* joint opinion reveals this: a regulation of abortion is invalid if it "has the *purpose or effect* of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U.S. at 877 (emphasis added). This means that even a regulation narrowly tailored to serve a compelling state interest is invalid if it prohibits any abortions before viability. After all, a prohibition is not just a substantial obstacle, but a complete obstacle. As one commentator supportive of abortion rights explained, "undue burden wholly lacks such a nexus inquiry: under *Casey*, courts must analyze a statute's purpose and its effects, but need not assess the relationship between the two." Emma Freeman, Note, *Giving* Casey *its Bite Back: The Role of Rational Basis Review in Undue Burden Analysis*, 48 Harv. C.R.-C.L. L. Rev. 279, 279–80 (2013).

The "purpose or effect" formulation will inevitably bar every attempt to limit the incidence of abortion, even those that don't prohibit particular abortions. As Justice Scalia correctly observed, *Casey* permits Indiana to try to persuade women to choose life "only so long as it is not too successful." *Casey*, 505 U.S. at 992 (Scalia, J., concurring in the judgment in part and dissenting in part).[3] Since courts cannot consider the

---

[3] Justice Scalia's quote brings to mind another issue that looms over most abortion cases. Planned Parenthood and other supporters of abortion rights say that they are "pro-choice." Yet they often challenge legislation simply intended to inform a woman's choice. For example, the plaintiff in this case also obtained a preliminary injunction prohibiting Indiana from enforcing its requirement that a woman view an ultrasound at least 18 hours before an abortion is performed unless she elects in writing not to do so. *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r, Ind. State Dep't of*

weight of the State's interest in a particular case, all that mat-ters is how effective the statute will be at limiting abortion. If we applied this standard to other constitutional claims, no plaintiff would ever lose. After all, state action prohibiting a plaintiff's speech would certainly erect a "substantial obsta-cle" to that speech, and state action prohibiting particular people from possessing firearms would be a "substantial ob-stacle" to the exercise of those individuals' Second Amend-ment rights. But that's not how it works. Instead, States may even prohibit political speech. See *Williams-Yulee*, 135 S. Ct. at 1682–83 (Kennedy, J., dissenting) ("The individual speech here is political speech. The process is a fair election. These

---

*Health*, 273 F. Supp. 3d 2013 (S.D. Ind. 2017), appeal filed No. 17-1883 (7th Cir.). Planned Parenthood knows that the ultrasound is an "invaluable tool in revealing the personhood of unborn children." National Institute of Family and Life Advocates, *A Comprehensive Medical Conversion Program*, https://nifla.org/life-choice-project-tlc/ (last visited April 6, 2018). That's why it denigrates pro-life pregnancy centers that seek to show ul-trasounds to women considering abortion. See Brief for Planned Parenthood Affiliates of California, et al., in *Nat'l Inst. of Family & Life Ad-vocates v. Becerra* at 29–30, No. 16-1140 (Sup. Ct. 2018).

Indeed, Planned Parenthood and its allies have gone as far as to sup-port California's effort to force pro-life pregnancy centers to advertise for abortion. See *Nat'l Inst. of Family & Life Advocates v. Harris*, 839 F.3d 823 (9th Cir. 2016), cert. granted sub nom. *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 464 (2017). One need not wonder what Planned Parenthood's reaction would be if a State were to require its clinics to ad-vertise for free ultrasounds and counselors at pro-life pregnancy centers. If Planned Parenthood were really pro-choice (and not just pro-abortion), it would encourage a client who had initially been happy to be pregnant to seek counseling elsewhere when she discovered that her unborn child had Down syndrome or another disability. Such counseling with an in-formed advocate for the living fetus would benefit both the woman and her unborn child.

realms ought to be the last place, not the first, for the Court to allow unprecedented content-based restrictions on speech."). And the federal government can withdraw Second Amendment rights from significant groups of people based on prior conduct. *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) (en banc) (upholding the constitutionality of 18 U.S.C. § 922(g)(9), which prohibits those convicted of misdemeanor domestic violence from possessing firearms). While these fundamental rights are subject to significant limitations under heightened scrutiny, the purported right to an abortion before viability is absolute because of *Casey*'s purpose or effect test.

That today's outcome is compelled begs for the Supreme Court to reconsider *Roe* and *Casey*. But assuming the Court is not prepared to overrule those cases, it is at least time to downgrade abortion to the same status as actual constitutional rights. The Court can start by permitting the States to assert their legitimate interests in defense of abortion laws. Since *Casey* disavowed universal application of strict scrutiny in abortion cases, the question remains how to determine the proper means-ends test to apply. Fortunately, one already exists that would give courts flexibility to adjust the level of scrutiny based on the severity of the "burden" on the putative abortion right: the *Anderson-Burdick* sliding scale the Court uses to evaluate election regulations.

*Anderson-Burdick* is a sliding scale of means-ends scrutiny. *Libertarian Party of New Hampshire v. Gardner*, 638 F.3d 6, 14 (1st Cir. 2011). If an election law imposes a severe burden on speech and association rights, it must satisfy strict scrutiny. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (citing *Norman v. Reed*, 502 U.S. 279, 289 (1992)). But if the law is "reasonable" and "nondiscriminatory," then rational basis review is proper

and "'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)); see also *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 189–91 (2008) (plurality opinion) ("However slight that burden may appear … it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" (quoting *Norman*, 502 U.S. at 288–89)). In this context, *Anderson-Burdick* would require a plaintiff challenging a restrictive abortion law to make a threshold showing that the regulation was a "severe" burden on the right. If the plaintiff could manage that, then the State would have to satisfy strict scrutiny. If not, then courts would uphold [the regulation] so long as it was rationally related to a legitimate government interest.

Replacing *Casey*'s "purpose or effect" test with *Anderson-Burdick*'s sliding scale (or any other means-ends test) would at least give Indiana a chance to defend its ban on discriminatory abortions. As it is, the State loses before it can even say a word. That disparate treatment of abortion cases is not only unfair, but lacks any basis in text, structure, or tradition. It is an aberration that should be corrected. I continue to agree with the dissenting justices in *Roe* and *Casey*. But if we are stuck with those landmark decisions, the abortion rights those cases created should at least be on a level playing field with the rest of the Constitution. The *Casey* abortion-specific test should be replaced with traditional means-ends scrutiny. This would go a long way towards normalizing the federal courts' abortion jurisprudence.

## B. Indiana Might Prevail Under Strict Scrutiny

If the Court were to agree to apply strict scrutiny to the nondiscrimination provisions, what would happen? Admittedly, this is a difficult question, because *Casey* has not permitted means-ends scrutiny of abortion laws for decades. Indiana appears to be the first State that has attempted to protect particular unborn children from abortion based on their human characteristics.[4] Nevertheless, the analysis should not be all that difficult. Nobody would dispute that Indiana has a compelling interest in protecting mixed-race children, women, and disabled individuals from discrimination. That the developing human lives Indiana seeks to protect are preborn shouldn't change that.

---

[4] Other states have followed Indiana's lead, so this particular issue is not going away. An Ohio district court recently granted a preliminary injunction prohibiting enforcement of a similar Ohio law. *Preterm-Cleveland v. Himes*, No. 1:18-cv-109, _ F. Supp. 3d _, 2018 WL 1315019 (S.D. Ohio Mar. 14, 2018). And the Utah House of Representatives recently passed a similar bill by a 54-17 vote this past February. Ben Lockhart, *Committee Likely to Prevent Senate Hearing on Bill Barring Down Syndrome Abortions, Sponsor Says*, Deseret News, Mar. 7, 2018, https://www.deseretnews.com/article/900012362/committee-likely-to-prevent-senate-hearing-on-bill-barring-down-syndrome-abortions-sponsor-says.html.

28                                                          No. 17-3163

Race, sex, and disability-selective abortions are obviously
all problematic,[5] but I will focus here on the particular prob-
lem of abortion due to a diagnosis of Down syndrome.[6] Per-
mitting women who otherwise want to bear a child to choose

---

[5] Opposing sex-selective abortions, for instance, used to be uncontro-
versial. As recently as 2007, the Ethics Committee of the American College
of Obstetricians and Gynecologists "oppose[d] meeting requests for sex
selection for personal and family reasons, including family balancing, be-
cause of the concern that such requests may ultimately support sexist
practices." American College of Obstetricians and Gynecologists Commit-
tee on Ethics, *Sex Selection*, No. 360, p. 3 (Feb. 2007), available at
https://www.nzord.org.nz/news/news-and-press-releases?a=4239.     The
Committee "share[d] the concern expressed by the United Nations and
the International Federation of Gynecology and Obstetrics that sex selec-
tion can be motivated by and reinforce the devaluation of women." *Id.* at
2. Research backs up this position, particularly noting the disastrous ef-
fects of widespread sex-selective abortion in Asia. See Hesketh, Lu, &
Xing, *The Consequences of Son Preference and Sex-Selective Abortion in China
and other Asian Countries*, 183 Canadian Med. Ass'n. J. 1374 (2011). Yet
Planned Parenthood, which claims to be a women's rights organization,
has still challenged a State ban on sex-selective abortion.

[6] Indiana's law and this litigation have provoked a public debate
about abortion of unborn children with Down syndrome. Nationally syn-
dicated columnists Marc Thiessen and George Will have weighed in
strongly opposing the practice. Marc A. Thiessen, *When Will We Stop Kill-
ing Humans with Down Syndrome*, Wash. Post, Mar. 8, 2018,
https://www.washingtonpost.com/opinions/when-will-we-stop-killing-
humans-with-down-syndrome/2018/03/08/244c9eba-2306-11e8-badd-
7c9f29a55815_story.html?utm_term=.57852865480a; George F. Will, *The
Real Down Syndrome Problem: Accepting Genocide*, Wash. Post, Mar. 14, 2018,
https://www.washingtonpost.com/opinions/whats-the-real-down-syn-
drome-problem-the-genocide/2018/03/14/3c4f8ab8-26ee-11e8-b79d-
f3d931db7f68_story.html?utm_term=.2ed16d15c40b. Ruth Marcus of the
Washington Post has defended it. Ruth Marcus, *I Would've Aborted a Fetus
with Down Syndrome. Women Need That Right*, Wash. Post, Mar. 9, 2018,
https://www.washingtonpost.com/opinions/i-wouldve-aborted-a-fetus-

abortion because the child has Down syndrome perpetuates the odious view that some lives are worth more than others and increases the "stigma associated with having a genetic disorder." Peter A. Benn & Audrey R. Chapman, *Practical and Ethical Considerations of Noninvasive Prenatal Diagnosis*, 301 J. Am. Med. Ass'n 2154, 2155 (2009). Weren't we done with that when society repudiated the disgraceful language in *Buck v. Bell*, 274 U.S. 200, 207 (1927), that "[t]hree generations of imbeciles are enough"? Yet some countries are now celebrating the "eradication" of Down syndrome through abortion. Alexandra DeSanctis, *Iceland Eradicates People with Down Syndrome*, National Review, Aug. 16, 2017, https://www.nationalreview.com/2017/08/down-syndrome-iceland-cbs-news-disturbing-report/. That not only devalues the lives of those living with Down syndrome, but it dis-incentivizes research that might help them in the future.

What is more, studies show that people with Down syndrome *and their parents and siblings* are quite happy and lead fulfilling lives. A 2011 Harvard study found that "[a]mong those surveyed, nearly 99% of people with DS indicated that they were happy with their lives, 97% liked who they are, and 96% liked how they look. Nearly 99% of people with DS expressed love for their families, and 97% liked their brothers and sisters." Skotko, Levine, & Goldstein, *Self-Perceptions From People With Down Syndrome*, 2011 Am. J. Med. Genetics 2360, 2360, 2364. In the same year, Boston Children's Hospital found that 99 percent of parents or guardians of Down syndrome children loved their child and 79 percent "felt their

---

with-down-syndrome-women-need-that-right/2018/03/09/3aaac364-23d6-11e8-94da-ebf9d112159c_story.html?utm_term=.8bcb5841a660.

outlook on life was more positive because of their child." Boston Children's Hospital, *Parents Siblings and People With Down Syndrome Report Positive Experiences*, available at http://www.childrenshospital.org/news-and-events/2011/september-2011/parents-sibings-and-people-with-down-syndrome-report-positive-experiences. (last visited April 19, 2018). Ninety-four percent of siblings 12 and older reported that they were proud of their Down syndrome brother or sister, and 88 percent said that they were better people because of their sibling. *Id.* Children with Down syndrome bring joy to everyone around them. And despite their limitations, they can go on to achieve great things. People like Karen Gaffney, who leads a non-profit foundation dedicated to advocating for those with Down syndrome, prove that point all the time. Gaffney has swam across Boston Harbor, completed a relay across the English Channel, and competed in the Escape from Alcatraz triathlon in the course of her advocacy. Down Syndrome International, *Karen Gaffney Braves the Elements to Complete Boston Harbour Swim*, https://ds-int.org/news/karen-gaffney-braves-elements-complete-boston-harbour-swim-down-syndrome-international-13.(last visited April 19, 2018).[7]

---

[7] To be clear, Indiana's compelling interest in prohibiting abortions sought because of the unborn child's disability stems primarily from the intrinsic value and dignity of all humans, before and after birth, regardless of their utilitarian worth. But the statistics show that, contrary to the belief of some, a diagnosis of Down syndrome is not a sentence to a life of misery. Instead, those with Down syndrome lead fulfilling lives and bring joy to everyone around them.

Even though Indiana cannot stop all abortions, it has a compelling interest in prohibiting those performed simply because the unborn child is of the wrong sex the wrong race or has a genetic disability. And it is hard to imagine legislation more narrowly tailored to promote this interest than the non-discrimination provisions. The challenged sections only prohibit abortions performed *solely* because of the race, sex, or disability of the unborn child. The doctor also must know that the woman has sought the abortion solely for that purpose. These are provisions that apply only to very specific situations and carefully avoid targeting the purported general right to pre-viability abortion. They will not affect the vast majority of women who choose to have an abortion without considering the characteristics of the child. Indeed, they will not even affect women who consider the protected characteristics along with other considerations. If it is at all possible to narrowly tailor abortion regulations, Indiana has done so.[8]

Because the nondiscrimination provisions are narrowly tailored to further a compelling state interest, they seem likely to satisfy strict scrutiny. This case thus highlights the problem with *Casey*'s "purpose or effect" test. While *Casey* purported to reject prior cases that gave short shrift to the State's interest in protecting unborn life, its abandonment of means-ends

---

[8] For comparison, the similar Ohio statute struck down in *Preterm-Cleveland* (referenced in footnote 4) is not as narrowly tailored as Indiana's law. The Ohio law prohibits the performance an abortion if the doctor "has knowledge that the pregnant woman is seeking the abortion, *in whole or in part*, because of" a fetal diagnosis of Down syndrome. Ohio Rev. Code § 2919.10(B) (emphasis added). Because the Ohio statute prohibits abortions performed due *in part* to a diagnosis of Down syndrome, it prohibits more abortions than the law challenged here.

scrutiny can produce absurd results. One of those is that Indiana has lost the ability to defend its abortion restrictions, even under "the most demanding level of judicial review." *Smith v. Shalala*, 5 F.3d 235, 238 (7th Cir. 1993).

I would prefer to sustain the nondiscrimination provisions. Because I have no choice but to follow Supreme Court precedent, I reluctantly concur in the court's judgment invalidating them.[9]

## II. The Fetal Remains Provision

The court also invalidates Indiana's requirement that abortion clinics bury or cremate the remains of the unborn child if the woman chooses to leave the remains with the clinic. I cannot agree.

The parties and the court agree that the fetal remains provision is subject only to rational basis review. "Legislation in question is presumed to be rational." *Peterson v. Lindner*, 765 F.2d 698, 705 (7th Cir. 1985). That is, the mere fact that this legislation passed both Houses of the Indiana General Assembly and was signed by the Governor endows it with a presumption of rationality.[10] Indeed, it is hard to overstate how

---

[9] As the court explains, the disclosure provision falls with the nondiscrimination provisions. If the nondiscrimination provisions are invalid, it follows that Indiana cannot require physicians to tell women that Indiana law prohibits abortions performed because of the race, sex, or disability of the unborn child. Therefore, I also join the court's judgment invalidating this provision.

[10] House Enrolled Act 1337 easily passed both Houses of the General Assembly. After amendments, the Senate voted 37-13 in favor and the House concurred in the Senate amendments by a vote of 60-40. Indiana General Assembly, 2016 Session, Actions for House Bill 1337,

No. 17-3163                                                                33

deferential our review is in rational basis cases under the
Equal Protection and Due Process Clauses. In an equal pro-
tection case, we've said that "the burden is upon the challeng-
ing party to eliminate any reasonably conceivable state of
facts that could provide a rational basis for the classification."
*Smith v. City of Chicago*, 457 F.3d 643, 652 (7th Cir. 2006). And
in a due process case, we've emphasized that review is
"highly deferential" to the point where government action
"must be 'utterly lacking in rational justification.'" *Brown v.
City of Michigan City*, 462 F.3d 720, 733 (7th Cir. 2006) (quoting
*Turner v. Glickman*, 207 F.3d 419, 426 (7th Cir. 2000)). "Under
rational basis review, the plaintiff almost invariably loses."
Susannah W. Pollvogt, *Unconstitutional Animus*, 81 Fordham
L. Rev. 887, 889 (2012).

The court errs in several respects. First, it draws a distinc-
tion from the Eighth Circuit, which has upheld a substantially
similar Minnesota law. Then, the court adopts Planned
Parenthood's red herring argument that Indiana cannot re-
quire fetal remains be disposed with dignity because unborn
children are not persons under the Fourteenth Amendment.
And finally, the court departs from traditional rational basis
review and requires far too close a fit between means and
ends. Combined, these errors produce a result that would
never happen in any context but abortion.

**A. Distinction from the Eighth Circuit**

---

https://iga.in.gov/legislative/2016/bills/house/1337#document-51b52d50
(last visited April 9, 2018).

34                                         No. 17-3163

In *City of Akron v. Akron Center for Reproductive Health, Inc.*, 462 U.S. 416, 451–52 (1983)—a decision overruled by *Casey* because it *undervalued* the State's interest in unborn life—the Supreme Court invalidated on vagueness grounds an Akron ordinance that required doctors performing abortions to "insure that the remains of the unborn child are disposed of in a humane and sanitary manner." But while the Court held that the ordinance failed to give doctors fair notice of what conduct would be criminalized, it was careful to explain that its decision wouldn't prevent Akron from enacting another ordinance with more definite terms. Indeed, the Court recognized in a footnote that States have a "legitimate interest in the proper disposal of fetal remains." *Id.* at 452. The problem with the ordinance wasn't that Akron could never regulate the disposition of fetal remains, but that its ordinance was not specific enough. *Akron* at least hinted that States may require that abortion doctors respect the dignity of the unborn child when disposing of her remains. What other interest could the Court have meant by the "*proper* disposal of fetal remains"? (emphasis added).

The Eighth Circuit then confronted a more definite statute in *Planned Parenthood of Minnesota v. Minnesota*, 910 F.2d 479 (8th Cir. 1990). The challenged Minnesota law required that fetal remains be disposed of "by cremation, interment by burial, or in a manner directed by the commissioner of health." Minn. Stat. § 145.1621(4). The court held the law was not vague because it specifically described the ways in which remains must be disposed. *Planned Parenthood*, 910 F.2d at 482–83. Having avoided the *Akron* problem, the court went on to conclude that the requirement was rationally related to Minnesota's legitimate interest in protecting "public sensibilities." *Id.* at 488.

No. 17-3163                                             35

This case is very similar to the Eighth Circuit's decision. The Indiana Administrative Code provision here says that each abortion clinic "shall provide for the disposition of an aborted fetus by any of the following methods: (1) In the earth in an established cemetery pursuant to Ind. Code § 23-14-34. (2) Cremation." 410 Ind. Admin. Code § 35-2-1(a). And similar to the Minnesota law, Indiana's law does not apply to women who choose to take the remains of their unborn children home rather than leave them at the clinic. See *Planned Parenthood*, 910 F.2d at 488 (holding that "given the privacy concerns implicit in activity in one's home," the State could regulate clinics and not individual women disposing remains at home); Ind. Code § 16-34-3-2(a) ("A pregnant woman who has an abortion under this article has the right to determine the final disposition of the aborted fetus."). The Indiana and Minnesota laws are substantially similar in every material respect.

The court tries to distinguish *Planned Parenthood of Minnesota*, noting that the Eighth Circuit said the overriding purpose of the Minnesota law was "protection of the public's sensibilities by ensuring that fetal remains be disposed of in a specified manner." *Planned Parenthood*, 910 F.2d at 488. Indiana's law, the court says, "goes well beyond the sanitary or unitary disposal of aborted fetuses, interests which are already being carried out under current Indiana law and health regulations prior to HEA 1337." Maj. Op. at 15–16. But, while the Eighth Circuit termed Minnesota's interest "protecting public sensibilities," in reality the same state interest is involved in both cases; the dignified and humane disposal of the remains of unborn children. Why else would both laws dictate two methods of disposal typical for humans, but not typical for medical waste? Whether you call it "public sensibilities," "morality," or "human dignity," the state interest is

the same. That interest is sufficient to justify the fetal remains provision.[11]

### B. Fourteenth Amendment Personhood

That leads me to the next point. The court says it cannot accept Indiana's purported interests in dignified and humane disposition of fetal remains because that would "require[] recognizing that the fetus is legally equivalent to a human." Maj. Op. at 16. According to the court, because unborn children are not recognized as persons under the Fourteenth Amendment, Indiana may not require they be treated as such. But this is a red herring. The Supreme Court's judgment that the Fourteenth Amendment does not protect the unborn certainly means that the States cannot interfere with the purported right to abortion. It also means that Indiana isn't *required* to treat fetal remains the same as other human remains, as it might be if the unborn had legal personhood. But it doesn't follow that the States can't—within the confines of *Roe* and *Casey*—recognize the dignity and humanity of the unborn. Indeed, a supermajority of the States already do just that by enforcing fetal homicide laws, the constitutionality of which has never been doubted. See Brief of Wisconsin, et al., as Amicus Curiae at 16; *Coleman v. DeWitt*, 282 F.3d 908, 912–13 (6th Cir. 2002) (rejecting a manslaughter defendant's argument that Ohio's fetal homicide statute was unconstitutional as applied to unborn children before viability).

---

[11] Indeed, an argument can be made that circulation under Circuit Rule 40(e) is appropriate here because the panel's decision creates a circuit split. See *United States v. Sinclair*, 770 F.3d 1148, 1158 n.2 (7th Cir. 2014). The panel avoids this problem by distinguishing *Planned Parenthood of Minnesota* from this case.

No. 17-3163                                                    37

Fetal homicide laws are different, the court says, because they "seek to address a valid state interest in promoting respect for potential life." Maj. Op. at 14. That misses the point. The court argues that States cannot treat unborn children as persons, but fetal homicide statutes, as well as wrongful death statutes treating non-viable fetuses as human beings, do just that. Even the term "fetal homicide" presumes that the unborn child is a person, at least for the purposes of those statutes, as "homicide" is "[t]he killing of one person by another." Black's Law Dictionary 802 (9th ed. 2009). It makes no sense to say that States may value the dignity of an unborn child in some instances, but not if the pregnant woman wants to abort her. Simply put, the fact that the unborn are not persons under the Fourteenth Amendment does not prohibit States from recognizing their inherent dignity and humanity.

### C. Fit between Means and Ends

Not content with devaluing the importance of Indiana's interests, the court proceeds to require far too tight a fit between those interests and the disposition requirements. The court says that Indiana isn't *really* treating aborted children as human beings because it still permits women to take fetal remains home from the abortion clinic and still allows for simultaneous cremation. So while the court's initial objection was that Indiana treats unborn children as too human, it then objects that the provision is irrational because it doesn't treat unborn children as human enough. That is not how rational basis review works.

The court's objections amount to claims that the fetal remains provision is underinclusive. But even where a law is "simultaneously overinclusive and underinclusive" it still

may "easily" withstand rational basis review "because 'perfection is by no means required' and [a] 'provision does not offend the Constitution simply because the classification is not made with mathematical nicety.'" *Wis. Educ. Ass'n Council v. Walker*, 705 F.3d 640, 656 (7th Cir. 2013) (quoting *Vance v. Bradley*, 440 U.S. 93, 108 (1979)). "[N]o legislation pursues its purposes at all costs." *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987). The Indiana General Assembly might rationally have decided that "given the privacy concerns implicit in activity in one's home," it did not want to regulate the conduct of women in their own homes. *Planned Parenthood*, 910 F.2d at 488. It could have also rationally concluded that it would be too costly to require individual cremation, or even that the law wouldn't have passed with such a requirement. These line-drawing questions are quintessentially legislative. Simply put, "the Constitution does not require [Indiana] to draw the perfect line nor even to draw a line superior to some other line it might have drawn. It requires only that the line actually drawn be a rational line." *Armour v. City of Indianapolis*, 566 U.S. 673, 685 (2012). The General Assembly acted rationally, so we lack the power to disturb its judgment.

***

Like the Eighth Circuit, I would conclude that Indiana's fetal remains provision is rationally related to the State's interest in protecting public sensibilities. I would add that Indiana has a significant interest in recognizing the dignity and humanity of the unborn child. "The traditional police power of the States is defined as the authority to provide for the public health, safety, and morals." *Tagami v. City of Chicago*, 875 F.3d 375, 379 (7th Cir. 2017) (quoting *Barnes v. Glen Theatre*,

No. 17-3163                                                          39

501 U.S. 560, 568–69 (1991)). The People of Indiana have spo-
ken. If we must permit abortion, they say, the victims of that
procedure should at least be entitled to be treated better than
medical waste. That judgment is not irrational.

I would reverse the judgment of the district court with re-
spect to the fetal remains provision and remand with instruc-
tions to enter judgment for the State.

### III. Conclusion

Indiana made a noble attempt to protect the most vulner-
able members of an already vulnerable group. That it must
fail is not due to lack of effort either by the legislators who
drafted it or the Solicitor General who ably argued before us.
The Supreme Court's abortion jurisprudence proved an in-
surmountable obstacle despite their best efforts. More than
anything, this case illustrates the extent to which abortion has
become the most favored right in American law. Without a
significant recalibration, the States sadly cannot protect even
unborn children targeted because of their race, sex, or a diag-
nosis of Down syndrome. But this court is powerless to
change that state of affairs. Only the Supreme Court or a con-
stitutional amendment can do that.

Until that time comes, there may be a workable standard
that would preserve the putative general right to pre-viability
abortion while permitting the States to prohibit certain abor-
tions provided the prohibitions are narrowly drawn to further
a compelling state interest. Prohibiting the targeting of partic-
ular unborn children who were originally welcomed but later
targeted based on their immutable characteristics would meet
that standard. If States cannot at least do this, abortion will
remain the most sacred constitutional right. Still, even with

the high wall that *Roe* and *Casey* have erected, it may be possible to ensure that States can place some meaningful limits on abortion. Scrapping *Casey*'s "purpose or effect" test in favor of traditional means-ends scrutiny would be a good place to start.

As it is, I am compelled to concur in the court's judgment invalidating the nondiscrimination provisions and the disclosure provision. With respect to the fetal remains provision, however, I am not so constrained. I would hold that it is a legitimate exercise of Indiana's police power. Therefore, I respectfully dissent from that portion of the court's opinion.

CERTIFIED COPY

A True Copy

Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

# United States Court of Appeals

### For the Seventh Circuit
### Chicago, Illinois 60604

June 8, 2018

*By the Court*:

No. 17-3163

| | |
|---|---|
| PLANNED PARENTHOOD OF INDIANA AND KENTUCKY, INC., *et al.*,<br><br>   *Plaintiffs-Appellees*,<br><br>  *v.*<br><br>COMMISSIONER OF THE INDIANA STATE DEPARTMENT OF HEALTH, *et al.*,<br><br>   *Defendants-Appellants*. | Appeal from the United States District Court for the Southern District of Indiana, Indianapolis Division.<br><br>No. 1:16-cv-00763-TWP-DML<br><br>Tanya Walton Pratt,<br>*Judge*. |

## O R D E R

  Defendants-appellants have requested en banc review in this case limited to the question of the constitutionality of Ind. Code § 16-34-3-4, which regulates the disposal of fetal remains after an abortion or miscarriage. A majority of the judges in active service have voted to grant the state's petition. Accordingly, the petition for rehearing en banc is **GRANTED**. Part II.B of the panel's opinion of April 19, 2018, *Planned Parenthood of Ind. and Ky., Inc. v. Comm'r of the Ind. State Dept. of* Health, 888 F.3d 300, 307–10 (7th Cir. 2018), is **VACATED**, and the judgment is also **VACATED** insofar as it affirmed the district court's decision to enjoin enforcement of the fetal disposition statute. The court will set a date for the en banc oral argument by separate order.

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

June 25, 2018

*By the Court*\*:

No. 17-3163

| | |
|---|---|
| PLANNED PARENTHOOD OF INDIANA AND KENTUCKY, INC., *et al.*, | Appeal from the United States District Court for the Southern District of Indiana, Indianapolis Division. |
| *Plaintiffs-Appellees*, | |
| *v.* | No. 1:16-cv-00763-TWP-DML |
| COMMISSIONER OF THE INDIANA STATE DEPARTMENT OF HEALTH, *et al.*, | Tanya Walton Pratt, *Judge*. |
| *Defendants-Appellants.* | |

## O R D E R

Defendants-appellants have requested en banc review in this case limited only to the question of the constitutionality of Ind. Code § 16-34-3-4, which regulates the disposal of fetal remains after an abortion or miscarriage. On June 8, 2018, the court granted the petition and vacated Part II.B of the panel's opinion of April 19, 2018, *Planned Parenthood of Ind. and Ky., Inc. v. Comm'r of Ind. State Dept. of Health*, 888 F.3d 300, 307–10 (7th Cir. 2018). However, information coming to the attention of a member of the court caused that judge to conclude that recusal was necessary and that the judge had been ineligible to vote on the petition for rehearing en banc. Taking into account that judge's recusal, the vote of the circuit judges in regular active service was evenly divided, and thus the necessary majority required by 28 U.S.C. § 46(c) for rehearing en banc was, and is, not present. Judges Easterbrook, Kanne, Sykes, Barrett, and Brennan voted to grant rehearing en banc. We therefore **VACATE** the order of June 8, 2018, and reinstate the panel's opinion.

---

\* Judge Scudder took no part in the consideration or decision of this matter.

No. 17-3163                                                                    Page 2

WOOD, *Chief Judge*, with whom *Circuit Judges* ROVNER and HAMILTON join, concurring.   Not every case in a highly controversial area deserves to be reheard by the *en banc* court. Just as the Supreme Court passes by many potentially interesting and important cases when it exercises its *certiorari* jurisdiction, particularly when either the facts or the law may stand in the way of a clean decision on the merits of the issue that concerns the Court, we must exercise the same restraint. Unless it is possible to identify a properly presented, important issue of law that lies within the power of this court to resolve, we should refrain from rolling out the big guns of the full court. Otherwise we risk issuing what would be at best an opinion correcting an error made by a panel, and at worst an advisory letter to the Supreme Court. The present case is not one that meets those criteria. Idiosyncratic procedural hurdles would block our ability to conduct a thorough review of the only issue the state of Indiana has asked us to rehear—the constitutionality of the fetal disposal provisions of House Enrolled Act No. 1337, Ind. Code §§ 16-34-3-4(a), 16-41-16-4(d), 16-41-16-5, and 16-41-16.7.6.

The state has not asked for rehearing *en banc* of the panel's ruling on the Sex Selective and Disability Abortion Ban, Ind. Code § 16-34-4, and the reason why is obvious: only the U.S. Supreme Court has the power to decide whether to change the rule of *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), which holds unequivocally that "a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability." See *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) ("it is this Court's prerogative alone to overrule one of its precedents"). The state's decision in this respect amounts to a waiver of its right to have this court reconsider that part of the panel's decision. In light of that waiver, I do not address that part of the case. The Supreme Court does not need essays from different federal judges to assist its own thinking. Should the state seek further review, I am confident that the parties will brief the issue ably, and that numerous *amicus curiae* contributions will also be filed. My focus instead is on the issue that was presented to us: the fetal disposal rules.

Planned Parenthood conceded that the disposal regulation does not implicate a fundamental right, and it then moved directly to the conclusion that the proper level of inquiry was rational-basis review. The panel properly decided the case in light of that strategic litigation choice. *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 888 F.3d 300, 307–08 (7th Cir. 2018). In doing so, the panel ably applied that level of scrutiny. I have little to add to its analysis except to wonder how, if respect for the humanity of fetal remains after a miscarriage or abortion is the state's goal, this statute rationally achieves that goal when it simultaneously allows any form of disposal whatsoever if the mother elects to handle the remains herself. It is not hard to hypothesize

disposal methods that would be far less respectful than those presently used for biological materials in clinics.

The problem, however, is that the parties' concession with respect to the standard of review—a choice that is capable of dictating the outcome—was probably incorrect. Without that concession, the court's review would have taken a different turn. This case involves a fundamental right: the woman's right to decide whether to carry a child (or, put negatively, whether to have an abortion). See *Roe v. Wade*, 410 U.S. 113 (1973). In my view, statutes such as Indiana's cannot properly be examined if the question of the standard of review is off the table, as it was for our panel.

In many cases, that choice will be outcome determinative. A look at the relevant Supreme Court decisions strongly suggests that rational-basis is not the proper level of scrutiny. The disposal of an aborted (or miscarried) fetus is just the final step in the overall process of terminating (or losing) a pregnancy. It thus implicates an interest with heightened constitutional protection: "the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State." *Casey*, 505 U.S. at 846. Therefore, the question for this court should have been whether the law "has the effect of placing a substantial obstacle in the path of a woman's choice." *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309 (2016) (quoting *Casey*, 505 U.S. at 877). To move forward with this case as if rational-basis were the proper standard would force us to decide an important issue with blinders on. The court would need to ignore the Supreme Court's admonition not to "equate the judicial review applicable to the regulation of a constitutionally protected personal liberty interest with the less strict review applicable where, for example, economic legislation is at issue." *Whole Woman's Health*, 136 S. Ct. at 2309. The fact that fetal-disposal regulations potentially affect the constitutional right to obtain a pre-viability abortion distinguishes this law from the countless cases that do not implicate a constitutional right—say, animal-welfare statutes. There are plenty of rationally enacted laws that do not burden any constitutional rights.

It does not matter for the constitutional concerns presented in this case that the disposal statute operates at the end of the procedure. Hypotheticals should make that point clear. A post-procedure spousal notification law, perhaps enforced by a criminal penalty, is no less a substantial obstacle than a pre-procedure notification requirement. And I expect that any woman would experience an undue burden on her right to have a pre-viability abortion if state law required her to check herself into a mental hospital for a week after the procedure was complete. In keeping with these principles, other courts have applied not the rational-basis standard, but the undue-burden standard, when considering the lawfulness of fetal remains regulations. See *June Med. Servs. LLC v. Gee*, 280 F. Supp. 3d 849 (M.D. La. 2017); *Hopkins v. Jegley*, 267 F. Supp. 3d 1024, 1098 (E.D. Ark. 2017), appeal filed, No. 17-2879 (8th Cir. Aug. 28, 2017); *Whole Woman's Health v. Hellerstedt*, 231 F. Supp. 3d 218,

No. 17-3163                                                                Page 4

227–29 (W.D. Tex. 2017).

     The forced limitation of this case to the rational-basis standard would distort any *en banc* consideration we could give. It is entirely possible that a state law would pass rational-basis, one-step-at-a-time, review, but would nonetheless impose an undue burden on a women's choice to have an abortion. The examples reviewed in *Casey* are good illustrations. That possibility suggests that leaving the panel's decision intact is unlikely to spell the end of fetal disposal litigation even in this circuit. Every nuance in this area is litigated over and over. Nor does our denying the motion for rehearing bring to an end litigation already progressing across the country. See, *e.g.*, *Hopkins v. Jegley*, No. 17-2879 (8th Cir. appeal docketed Aug. 28, 2017); *June Med. Servs. LLC v. Gee*, No. 3:16-cv-00444-BAJ-RLB (M.D. La. docketed July 1, 2016); *Whole Woman's Health v. Smith*, No. 1:16-cv-01300-DAE-AWA (W.D. Tex. docketed Dec. 12, 2016). If the Supreme Court wants to take some aspect of this issue, it will have ample opportunity to do so.

     Moreover, further review of this case would necessarily proceed without the benefit of a record developed with the proper legal standard in mind. Given the posture in which this case comes before us, it is unremarkable that, as Judge Easterbrook observes, plaintiffs have not contended or shown that the fetal disposal statute is a substantial obstacle. Easterbrook, J., dissenting, *post* at slip op. 7.   Litigating on a "rational-basis" standard makes such evidence unnecessary; under the proper standard of review, however, evidence does make a difference, and it should be developed before the court charges headlong into such an important issue. And that is not the only evidence currently missing as a result of a misapprehension of the standard of review. For example, the evidence is thin to nonexistent on the costs imposed by the disposal regulations—costs that include not only a higher out-of-pocket dollar price for the procedure, but that might include psychological trauma that chills women from seeking abortions or medical care in relation to miscarriages because of the potential stigmatizing impact of these measures. Nor did the plaintiffs have reason to explore how the disposal statute might work in tandem with other regulations in a way that unduly burdens the right to choose, as is required under *Whole Women's Health*. 136 S. Ct. at 2309, 2313. The record simply did not explore what should have been the central issues and what are likely to be the primary points of contention in the next case to come along.

     It would be a waste of this court's resources to accept a case for *en banc* review if the only thing we could say is that the parties' decision to use rational-basis review is binding on us, but that everything might be different if the standard from *Casey* and *Whole Women's Health* were applied and a proper record in light of that standard had been developed. It would not quite be a hypothetical case, but it would be too close for comfort. Important as these issues are, the only prudent course to take is to forgo *en banc* review this time and await a case that more cleanly presents all relevant issues.

     I therefore concur in the decision to deny rehearing *en banc*.

No. 17-3163                                                                    Page 5

EASTERBROOK, *Circuit Judge*, with whom *Circuit Judges* SYKES, BARRETT, and BRENNAN join, dissenting from the denial of rehearing en banc. This case concerns two statutes. The first, which I call the eugenics statute, makes it illegal to perform an abortion for the purpose of choosing the sex, race, or (dis)abilities of a child. Ind. Code §§ 16-34-4-1 to 16-34-4-9. The second, which I call the disposal statute, requires fetal remains to be cremated or buried; they cannot be placed in medical trash, although the remains of multiple fetuses may be incinerated together. Ind. Code. §§ 16-34-3-4(a), 16-41-16-4(d), 16-41-16-5, 16-41-16-7.6.

The panel held the eugenics statute unconstitutional because the lead opinion in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 879 (1992) (O'Connor, Kennedy & Souter, JJ.), says that "a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability." The panel held the disposal statute unconstitutional because fetal remains are not remains of "persons" within the scope of the Due Process Clause, see *Roe v. Wade*, 410 U.S. 113, 158–59 (1973), making it irrational to require them to be treated as if they were. See 888 F.3d 300, 305–07 (eugenics statute), 307–10 (disposal statute) (7th Cir. 2018).

I am skeptical about the first of these conclusions because *Casey* did not consider the validity of an anti-eugenics law. Judicial opinions are not statutes; they resolve only the situations presented for decision. Consider a parallel in private law. Judges often said that employers could fire workers for any or no reason. That's the doctrine of employment at will. But by the late twentieth century courts regularly created exceptions when the discharge was based on race, sex, or disability. *Casey* does not tell us whether a parallel "except" clause is permissible for abortions.

*Casey* and other decisions hold that, until a fetus is viable, a woman is entitled to decide whether to bear a child. But there is a difference between "I don't want a child" and "I want a child, but only a male" or "I want only children whose genes predict success in life." Using abortion to promote eugenic goals is morally and prudentially debatable on grounds different from those that underlay the statutes *Casey* considered.

None of the Court's abortion decisions holds that states are powerless to prevent abortions designed to choose the sex, race, and other attributes of children. It is becoming possible to control some aspects of embryos' genomes. See Clyde Haberman, *Scientists Can Design 'Better' Babies. Should They?*, NEW YORK TIMES, June 10, 2018. States may regulate that process when conception is by *in vitro* fertilization. Does the Constitution supply a right to evade regulation by choosing a child's genetic makeup after conception, aborting any fetus whose genes show a likelihood that the child will be short, or nearsighted, or intellectually average, or lack perfect pitch—or be the

"wrong" sex or race? *Casey* did not address that question. We ought not impute to the Justices decisions they have not made about problems they have not faced.

Still, Indiana has not asked us to rehear this part of the panel's decision. Only the Supreme Court can determine the answer; we might guess, but the Justices can speak authoritatively. So although 18 states have filed an *amicus* brief asking us to rehear this part of the decision en banc, I am content to leave it to the Supreme Court.

The panel's holding on the disposal statute is another matter, because "X is not a person" does not imply "X is beyond regulatory authority." Think of animal-welfare statutes. Dogs may not be beaten for fun. Bullfights are forbidden. Horses may not be slaughtered in Illinois for the dinner table under a statute this circuit sustained largely on animal-welfare grounds. See *Cavel International, Inc. v. Madigan*, 500 F.3d 551 (7th Cir. 2007). Accord, *Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*, 476 F.3d 326 (5th Cir. 2007). Many states have laws that prescribe how animals' remains must be handled. See, e.g., Ala. Code §3-1-28; Ga. Code §4-5-5; Iowa Code §167.18(1); Kan. Stat. §47-1219; Mich. Comp. Laws §287.671(2); Mo. Stat. §269.020; 3 Pa. Stat. §2352(a)(4); Utah Code §4-31-102(1); Wis. Stat. §95.50; Wyo. Stat. §35-10-104. The panel has held invalid a statute that would be sustained had it concerned the remains of cats or gerbils.

Animal-welfare statutes are rational not simply because all mammals can feel pain and may well have emotions, but also because animal welfare affects human welfare. Many people feel disgust, humiliation, or shame when animals or their remains are poorly treated. We wrote in *Cavel* that a ban on slaughtering horses for human consumption is rationally related to the goal of reducing dismay at poor treatment of these creatures. 500 F.3d at 557. Isn't that equally true of a statute about fetal remains?

In giving a negative answer, the panel created a conflict with *Planned Parenthood of Minnesota v. Minnesota*, 910 F.2d 479 (8th Cir. 1990). The Eighth Circuit sustained a statute equivalent to Indiana's. The majority distinguished *Minnesota* on the ground that Planned Parenthood of Minnesota conceded that the state has a legitimate interest in protecting public sensibilities, while Planned Parenthood of Indiana and Kentucky denies that. 888 F.3d at 309. This shows a difference in litigation strategies, but to deny that public sensibilities can matter (as the panel did) creates a conflict with decisions in many circuits, on subjects ranging from animal welfare to aesthetic zoning to obscenity. Many a state law promotes public morals in a way that John Stuart Mill would disapprove, but he was not among the drafters of the Fourteenth Amendment. (The overlap between Mill's *On Liberty* and Mr. Herbert Spencer's *Social Statics* is considerable, but Justice Holmes's dissent in *Lochner v. New York*, 198 U.S. 45, 75–76

(1905), has prevailed and *Social Statics* is not part of the Constitution. Neither is *On Liberty*.)

The panel went on to observe that Indiana is concerned about the interest of the fetus, while Minnesota isn't. This implies that the same statute could be passed again in Indiana, and held valid, as long as the legislative history is different. Yet the intent behind a law does not affect rational-basis analysis. A law is valid if a rational basis can be imagined, no matter what legislators thought or said. See, e.g., *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313–17 (1993). The panel also observed that the disposal statute does not prevent a woman from taking possession of the fetal remains and disposing of them as she pleases, 888 F.3d at 309, which is true but irrelevant. A state need not regulate comprehensively in order to regulate at all. See, e.g., *Bowen v. Owens*, 476 U.S. 340, 347 (1986). It may take one step at a time.

Plaintiffs have not argued that the disposal statute places a "substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." *Casey*, 505 U.S. at 878 (lead opinion), quoted and applied in *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2300 (2016). The disposal statute operates after the abortion is complete. The costs of satisfying the statute may be rolled into the procedure's price and so in principle could affect a woman's decision to have an abortion. But plaintiffs do not contend, and the record does not show, that the costs are substantial. (They estimate an incremental cost of $6 to $12 but do not explain how the figure was derived.) I could not find data suggesting that the price of an abortion in Minnesota rose at all after it adopted a disposal statute, that abortion services there have become harder to procure, or that the number of abortions has been affected. Rational-basis analysis therefore is the appropriate approach, and our panel did not follow the Supreme Court's rules for rational-basis inquiry. There is no need to leave this matter to the Justices; rehearing en banc is preferable to a constitutional decision preventing Indiana from implementing a law materially the same as one that has been held valid, and operates daily, elsewhere in the nation.

Chief Judge Wood observes that plaintiffs' litigation choices, including their decision to produce "thin to nonexistent" (slip op. 4) evidence about the effects of the disposal statute, prevent us from deciding whether this law puts a "substantial obstacle" in a woman's path. She invites future litigants to supply more evidence and make different legal arguments. But if more than 25 years' experience in Minnesota does not furnish evidence of a substantial obstacle, where would it come from? And why would any other litigant choose a different strategy? Now that the disposal statute has been held to lack a rational basis, there will be no more litigation in this circuit, no

No. 17-3163                                                                 Page 8

opportunity for the full court to consider other lines of argument. Kicking the can down
the road is not an attractive option, for we have reached the road's end.

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit